**Andrew S. NELSON, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–4330.

Court of Appeals of Alaska.

May 13, 1994.

Motion to Publish Granted May 13, 1994.

Suzanne Weller, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant.

Nancy R. Simel, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., MANNHEIMER, J., and WOLVERTON, District Court Judge.*

### OPINION

MANNHEIMER, Judge.

Andrew S. Nelson appeals his convictions for first-degree murder and attempted murder, AS 11.41.100(a)(1) and AS 11.31.100(a), as well as the sentence he received for these crimes. We affirm Nelson's convictions, but we remand this case to the superior court to reconsider Nelson's sentence.

In January 1989, Andrew Nelson met Sandra Pogany while they were registering for classes at the University of Alaska in Anchorage. Nelson and Pogany began dating, and they became romantically involved.

Early in the spring of 1990, Pogany expressed dissatisfaction with their relationship; she told Nelson that she wanted to date other men. Nelson was upset at this

news, and he became increasingly distraught in the summer of 1990 when it became clear that Pogany intended to end their relationship.

On August 4, 1990, Nelson decided to kill Pogany's mother. He took a pistol from his home, purchased a "brick" of ammunition (10 boxes, each containing 50 cartridges), then drove to the Pogany family home. However, Nelson ultimately abandoned his plan to kill Mrs. Pogany.

Nelson then went to Russian Jack Park and contemplated suicide, but he rejected this idea. He thought about shooting Pogany and possibly himself. He then considered going to talk to Pogany and shooting her in the leg so that she could not run away.

After mulling over these various plans, Nelson drove to an undeveloped area behind the Anchorage International Airport, where he test-fired his handgun to insure it would not jam. Nelson then drove around downtown Anchorage, where he spotted Pogany's truck. Nelson stayed and maintained surveillance of the truck for several hours.

Around 2:30 a.m., Pogany and a man she was dating, Thomas Van Flein, returned to the truck. When Pogany and Van Flein began to embrace inside the cab of the truck, Nelson became extremely angry and jealous. He decided that both Pogany and Van Flein should die.[1] Nelson left his observation point, crossed the street, crouched behind the truck, and fired eight bullets into the cab of the truck. Pogany was killed and Van Flein was seriously injured.

An Anchorage grand jury indicted Nelson for the first-degree murder of Sandra Pogany and the attempted murder of Thomas Van Flein. A superior court jury found Nelson guilty of both crimes. Superior Court Judge John Reese sentenced Nelson to two consecutive 99-year terms, for a composite sentence of 198 years' imprisonment.

Nelson challenges various procedural and evidentiary aspects of his trial.

---

\* Sitting by assignment of the chief justice made pursuant to Article IV, Section 16 of the Alaska Constitution.

**1.** Testimony at trial also revealed that Nelson consciously weighed the probable consequences of his action before he shot Pogany and Van Flein. Nelson calculated that he would likely receive 30 to 40 years in prison for the murders, and he concluded that he should kill the two anyway.

Nelson's first contention is that the superior court should not have ordered him to submit to an independent psychiatric examination. This issue arose because, during a pre-trial hearing on April 10, 1991, Nelson's attorney indicated that he planned to call Dr. G. Christian Harris, a psychiatrist, to testify for the defense at trial. The defense attorney said that he had not decided whether Dr. Harris would testify "solely on the issue of intent, or whether [Dr. Harris would testify in support of] a defense under the applicable statutes". (Nelson's attorney was apparently referring to AS 12.47.010 and AS 12.47.020.) Based upon the defense attorney's representation, Superior Court Judge Brian C. Shortell ordered Nelson to file a formal notice within one week of any defenses that would be based on expert testimony. Judge Shortell further ordered that, conditioned on Nelson's giving notice that he intended to rely on a psychological defense, Nelson would undergo psychiatric examination by a state-selected doctor on May 14, 1991.

The following week (April 17), Nelson filed formal notice of his intent to call Dr. Harris as an expert witness. The notice was cursory; it did not specify the expected subjects of Dr. Harris's testimony. On May 7, the prosecution filed a motion seeking a psychiatric examination of Nelson pursuant to AS 12.47.-070.[2] From the State's pleadings, it appears that the prosecution was prompted to file a motion (rather than rely on the May 14 examination previously scheduled by Judge Shortell) because, in conversations between the prosecutor and defense attorney, Nelson's attorney had told the prosecutor that he believed the State had no right to examine Nelson. The defense attorney's assertion was based on the fact that Nelson had never filed formal notice of an intent to rely on either a defense of insanity under AS 12.47.-

010 or a defense of diminished capacity due to mental disease or defect under AS 12.47.-020.

The next day (May 8), Judge Shortell granted the State's motion. Judge Shortell declared that, because Nelson had given notice that Dr. Harris would testify as an expert witness for the defense, the court had "reason to believe that a mental disease or defect of the defendant [would] ... become an issue in the case", and thus it was appropriate for Nelson to submit to examination by a psychiatrist retained by the government.

Nelson's attorney apparently filed an opposition to the prosecution's motion, but that pleading is not part of the record on appeal. That opposition prompted Judge Shortell to hold a hearing, but the main topic of dispute at this hearing was whether AS 12.47.020(b) was constitutional.[3] With regard to whether Nelson should undergo an independent psychiatric examination, Nelson's attorney conceded that Dr. Harris would in fact be testifying on the issue of whether a mental disease or defect rendered Nelson incapable of forming an intent to kill, and Nelson's attorney never directly challenged Judge Shortell's decision to order an independent psychiatric evaluation.

Nelson was examined by Dr. Irvin Rothrock, a psychiatrist hired by the government. However, when the prosecution called Dr. Rothrock to the stand at Nelson's trial, Nelson objected to Dr. Rothrock's testimony. For the first time, Nelson raised the argument (explained in more detail below) that AS 12.47.070 did not apply to his case and that therefore Judge Shortell had lacked authority to order Nelson's examination by an independent psychiatrist. The trial judge, Superior Court Judge John Reese, ruled that Nelson's objection was moot.

2.  This statute provides, in pertinent part:
    *Psychiatric Examination.* (a) If a defendant has filed a notice of intention to rely on the affirmative defense of insanity under AS 12.-47.010 or has filed notice under AS 12.47.-020(a), or there is reason to doubt the defendant's fitness to proceed, or there is reason to believe that a mental disease or defect of the defendant will otherwise become an issue in the case, the court shall appoint at least two qualified psychiatrists or two forensic psychol-

ogists ... to examine and report upon the mental condition of the defendant.

3.  Nelson argued that the legislature acted unconstitutionally when, in AS 12.47.020(b), it declared that a defendant who proves diminished capacity through mental disease or defect should not be released but rather should be institutionalized in the same manner as if the defendant had proved the affirmative defense of insanity.

Judge Reese declared that, regardless of whether Judge Shortell's order had been proper at the time it was entered, it was now clear that Nelson intended to rely on a psychiatric defense (lack of capacity to form an intent to kill), and therefore the government would now be entitled to have Nelson examined by an independent psychiatrist if that examination had not already occurred. Judge Reese therefore allowed the prosecution to present Dr. Rothrock's testimony.

On appeal, Nelson renews his argument that Judge Shortell committed error when he ordered Nelson to be examined by a government-retained psychiatrist under AS 12.47.-070. Nelson concedes that this statute authorizes an independent examination of the defendant whenever "there is reason to believe that a mental disease or defect of the defendant will ... become an issue in the case". And mental disease or defect was clearly an issue in Nelson's case; indeed, in his brief to this court, Nelson declares that Dr. Harris "was the central witness for the defense". However, Nelson contends that AS 12.47.070 is unresolvably in conflict with Alaska Criminal Rules 16(c)(4) and (c)(5).

Criminal Rules 16(c)(4) and (5) read, in pertinent part:

(4) *Reports or Statements of Experts.* The trial court may require that the prosecuting attorney be informed of and permitted to inspect and to copy or photograph any reports or statements of [defense] experts made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments or comparisons which are intended by the defendant to be used at trial. Information obtained by the state under the provisions of this section shall be used only for cross-examination or rebuttal of defense testimony.

(5) *Notice of Intent to Raise Insanity Defense.* Following substantial compliance by the state with section (b) of this rule[,] a defendant who intends to offer evidence of a defense of insanity shall inform the state of such intention at the time of plea or at such other time as may be designated by the trial court. The court may order the defendant to submit to a psychiatric examination by a psychiatrist or psychologist selected by the court, and the report shall be made available to both parties.

Nelson claims that these rules supplant AS 12.47.070 because they pre-date that statute and because AS 12.47.070 was not passed by two-thirds' vote for the specific purpose of amending Rule 16(c). *See Leege v. Martin,* 379 P.2d 447, 450–51 (Alaska 1963).

Our review of this issue is necessarily *de novo,* since Judge Reese found the question moot and did not resolve it.[4]

■ Nelson's argument rests on a constricted reading of Rules 16(c)(4) and (c)(5). On its face, Rule 16(c)(4) authorizes a trial court to order that the prosecuting attorney be given access to the reports and statements of defense experts, including the results of mental examinations that the defense intends to use at trial. Nelson contends that Rule 16(c)(4) implicitly bars a trial judge from issuing any other discovery order. In particular, Nelson argues that Rule 16(c)(4) precludes a trial judge from ordering a defendant to submit to an independent psychiatric examination unless such an examination is specifically authorized by Rule 16(c)(5).

The text of Rule 16(c)(4) contains no such restriction, and we decline to infer one. While the rule limits the ways in which the government can use reports and test results obtained from defense experts, Rule 16(c)(4) simply does not address the question of whether a court may order independent examination or scientific testing of the defendant or the defendant's possessions or any other person or thing whose mental or physical properties are at issue in the case.

Nelson's textual analysis of Rule 16(c)(4) is cursory at best. He cites no authority for his restrictive interpretation of the rule. Moreover, his suggested interpretation is at odds with the declared purpose of Rule 16: to "expedite trial, minimize surprise, ... [and provide pre-trial disclosure] as full and

---

4. Even if the superior court had ruled on Nelson's claim, we would still exercise independent review because the question is one of law. *See*

*Stiegele v. State,* 685 P.2d 1255 (Alaska App. 1984).

free as possible consistent with protection of persons, effective law enforcement, and the adversary system". Criminal Rule 16(a).

As exemplified by the facts of Nelson's case, these purposes would be thwarted by Nelson's interpretation of the rule. When Judge Reese overruled Nelson's objection to Dr. Rothrock's testimony, he found that Nelson's defense was clearly based on psychiatric testimony that Nelson lacked the capacity to form an intent to kill. Given Nelson's defense, Judge Reese declared that he certainly would have ordered Nelson's examination if Judge Shortell had not previously ordered the examination.

Nelson asks us to read Rule 16(c)(4) not only to bar Judge Shortell from ordering a pre-trial psychiatric examination, but also to bar Judge Reese from ordering a mid-trial examination—even after Nelson presented Dr. Harris's testimony and specifically asked the jury to acquit him of first-degree murder due to his mental condition. We can not interpret Rule 16(c)(4) in this fashion.

■ Nelson next argues that, even if Rule 16(c)(4) does not bar the independent psychiatric examination, Criminal Rule 16(c)(5) does. Rule 16(c)(5) authorizes a trial court to order a defendant to undergo independent psychiatric examination when the defendant "intends to offer evidence of a defense of insanity". Nelson points out that he never formally raised an insanity defense. He therefore contends that the superior court lacked any authority to order him to submit to an independent examination.

As he did with regard to Rule 16(c)(4), Nelson argues that Rule 16(c)(5) must be interpreted to forbid anything it does not specifically permit. Nelson asserts that Rule 16(c)(5) was intended to preclude a trial judge from ever ordering an independent psychiatric examination of a defendant unless and until that defendant filed a formal notice of an intent to "offer evidence of a defense of insanity". We again reject Nelson's restrictive interpretation.

Well before trial began, Nelson's attorney announced that he would present the testimony of a psychiatrist, Dr. Harris, to prove that Nelson, due to his mental condition, lacked an intent to kill. Judge Shortell responded reasonably by ordering Nelson to undergo an independent psychiatric evaluation, and Judge Reese responded reasonably by allowing the jury to hear the results of that independent evaluation. We can not accept Nelson's assertion that, because he never gave formal notice of an insanity defense, neither Judge Shortell nor Judge Reese was authorized to order an independent psychiatric examination. Such an interpretation of Rule 16(c)(5) would contradict not only the purposes listed in Rule 16(a) but common sense as well.

For these reasons, we affirm the superior court's ruling that, under AS 12.47.070, Nelson could be examined by an independent psychiatrist even though Nelson never gave formal notice of a defense under either AS 12.47.010 or AS 12.47.020. We turn now to Nelson's claim that the prosecuting attorney asked improper questions when she cross-examined Dr. Harris and examined Dr. Rothrock.

On two occasions before the murder of his daughter, Mr. Pogany reported incidents of vandalism to the police. Both acts of vandalism were directed toward his airplane. On one occasion, someone placed sugar in the aircraft's fuel tank. Later, in early June 1990, someone exploded a pipe bomb in the aircraft, resulting in its destruction.

On August 7, 1990 (two days after the shooting of Pogany and Van Flein), Anchorage Police Investigator Kenneth Spadafora received a telephone call from B.B., a classmate of Nelson's brother, Greg Nelson. B.B. told Investigator Spadafora that, approximately one or two months before, he had had a conversation with Greg Nelson regarding the bombing of Mr. Pogany's airplane. According to B.B., Greg Nelson had said that his brother (Nelson) had had an argument with Ms. Pogany, that his brother was upset with Ms. Pogany, and "that's why we did it." Greg Nelson also told B.B. that they had used a pipe bomb.

Police laboratory analysis of the bomb indicated that a double-based smokeless gunpowder was used in the bomb. When the Nelson residence was searched following the

murder, a large amount of this same type of powder was found.

As discussed earlier, Dr. G. Christian Harris testified at Nelson's trial that, in his opinion, Nelson had been suffering a major depressive episode when he shot Pogany and Van Flein, and that this major depression had impaired Nelson's ability to form an intent to kill. Dr. Harris's conclusion that Nelson had lacked an intent to kill rested in part on Dr. Harris's understanding that Nelson did not have a significant history of antisocial, aggressive, or violent conduct. (Dr. Harris testified that he was aware of only one antisocial episode in Nelson's past: an act of shoplifting.)

During cross-examination, however, Dr. Harris admitted that his notes from his interview with Nelson showed that Nelson had mentioned something about bombing a plane:

> PROSECUTOR: And, Doctor, didn't you testify that there was nothing else significant that you found out [about Nelson's history and background]? You mentioned the alcoholism, . . . the shoplifting. You indicated that there is nothing else significant that you found, isn't that correct?
>
> DR. HARRIS: Well, I may have. There was some mention—and I, this is my error—having to do with a bombing of an airplane. And I did not go back to get any information about that particular episode. And so I can't really comment on that. But aside from that possibility, whatever that was about—whether it was an accusation or whatever, I don't know.
>
> . . . .
>
> PROSECUTOR: [Y]ou didn't think there was anything significant about the bombing of a plane?
>
> DR. HARRIS: I told you I made an error.
>
> PROSECUTOR: So you would admit, Doctor, that that's something that you should have looked into?
>
> DR. HARRIS: It's something that has been alluded to elsewhere that I'm satisfied does not reflect anything having to do with violence or antisocial personality.

> PROSECUTOR: Well, Dr. Harris, assuming that Mr. Nelson had in fact bombed the plane, doesn't that indicate violence, or aggression, or anger?
>
> DR. HARRIS: Yes.
>
> PROSECUTOR: And didn't you testify [earlier] that you had not found any indication of that?
>
> DR. HARRIS: Yes.
>
> PROSECUTOR: And so wouldn't this affect that conclusion of yours?
>
> DR. HARRIS: Depending on what the actual story is about that, it might.
>
> PROSECUTOR: And, Doctor, assuming that the bombing of the plane perhaps directed at the Pogany family, would that be of significance?
>
> DR. HARRIS: It could be, yes.
>
> . . . .
>
> PROSECUTOR: And, Doctor, wouldn't it be significant if the bombing of this plane—assuming it occurred during the time that they were having the problems, he and Sandra Pogany—would it be significant that it happened during that time period?
>
> DR. HARRIS: It could be of significance, yes.
>
> . . . .
>
> PROSECUTOR: Now, Doctor, assuming that the bombing occurred just two months before the murder, and that it was Gary Pogany's airplane, and that it followed a discussion [about] Sandra Pogany telling her relatives that she was breaking up with Andy, and he found out about that and was angry, wouldn't that have significance?
>
> DR. HARRIS: It could have.
>
> . . . .
>
> PROSECUTOR: And, Doctor, bombing a plane would require pretty intentional conduct, wouldn't it? You'd have to get a bomb, you would have to place a bomb, you would have to set the bomb off, correct?
>
> DR. HARRIS: Well, it would certainly involve the same level of intent that we would associate even with the events of August 4 and 5, in the sense that it could be that it was massively affected by some

mental disorder or mental disease. Or it might have been that he wasn't that ill in mid-June. I certainly think that he was much more deranged by mid-July, for instance, than he was in mid-June.

PROSECUTOR: But this is not something that you took into consideration in formulating your opinion in this case, is that correct?

DR. HARRIS: No, I did not go back and question him about this bombing a plane allegation.

PROSECUTOR: When you prepared your report in this case, Dr. Harris, did you review your notes?

DR. HARRIS: Yes, I did. Somehow I missed that.

Nelson's attorney did not object at any point during this cross-examination.

The next day, the prosecution called Dr. Rothrock to the stand during its rebuttal case. During her direct examination of Dr. Rothrock, the prosecutor asked him hypothetical questions concerning the allegation that Nelson had participated in the bombing of an airplane:

PROSECUTOR: Dr. Rothrock, [turning] to some information that Mr. Nelson may not have given you, to see if . . . it has any significance to you. Did he [Nelson] indicate anything to you about a plane-bombing incident?

DR. ROTHROCK: No.

PROSECUTOR: Dr. Rothrock, assuming that you were given information that Mr. Nelson had in fact participated in the bombing of Gary Pogany's airplane on June 8th or June 9th, two months before the murder, and that that bombing of the plane occurred after an argument with Sandra Pogany, would that have significance to you?

DR. ROTHROCK: Well, certainly the making of a pipe bomb and putting it in a plane and detonating it would be an awfully complicated act to ascribe to some sort of unconscious reflex behavior. I would assume this had to be intentional behavior. It was intentional[ ] behavior occurring within the context of being very emotional-

ly upset at Sandy. And I think, there, you have . . .

DEFENSE COUNSEL: Your Honor, I think that this is going well beyond the hypothetical. It's assuming facts [that are] not in evidence, and . . . I believe that, at this point, we're into 404(b) material that goes well beyond the exception. . . .

A colloquy then ensued between the prosecutor, the defense attorney, and Judge Reese. The discussion ended in the following way:

PROSECUTOR: Your Honor, I'm willing to move on, but [my questions were] in response to the information that Dr. Harris had, that there was a plane bombing that Mr. Nelson did not inform Dr. Rothrock about, and I'm just trying to find out what significance this sort of information would have . . .

DEFENSE COUNSEL: Well . . .

THE COURT: Make sure that what Dr. Rothrock is responding to is the same thing that we heard about from Dr. Harris. It shouldn't go beyond that.

DEFENSE COUNSEL: To make it clear: Dr. Harris indicated that it was an indication of an accusation of a bombing, and he didn't go beyond that. Now we're . . . into all sorts of things that, I have no idea where they're coming from. And perhaps . . .

THE COURT: That was the extent of . . .

DEFENSE COUNSEL: . . . we should have a hearing as to where they're coming from.

THE COURT: [To the prosecutor:] Do you need to pursue this? If so, you'll need to make that distinction. Or you can move on.

PROSECUTOR: I'll narrow the question down, Your Honor.

THE COURT: Okay.

At the conclusion of this discussion, the prosecutor asked Dr. Rothrock two more questions about the plane bombing allegation and then moved on. Nelson's attorney did not object to the prosecutor's follow-up questions, nor did he request any other relief from the court until near the end of trial, when the defense attorney proposed an in-

struction concerning facts mentioned or assumed in hypothetical questions to expert witnesses. Judge Reese gave the proposed instruction, which read:

> In examining an expert witness, counsel may propound to him a type of question known in the law as a hypothetical question. By such a question the witness is asked to assume to be true a set of facts, and to give an opinion based on that assumption.
>
> In permitting such a question, the court does not rule, and does not necessarily find that all the assumed facts have been proved. It is for you, the jury, to find from all the evidence whether or not the facts assumed in a hypothetical question have been proved. If you should find that any assumption in such a question has not been proved, you are to determine the effect of that failure of proof on the value and weight of the expert opinion based on the assumed facts.

■ On appeal, Nelson contends that the prosecutor's questions to Dr. Harris and Dr. Rothrock violated Alaska Criminal Rule 404(b) (governing admission of evidence of other crimes), and that this violation of Rule 404(b) deprived him of a fair trial. Nelson asserts that the prosecutor's hypothetical questions to Dr. Harris and Dr. Rothrock were direct evidence of prior bad acts, that there was no proper purpose for these questions, and that the questions should have been excluded as unfairly prejudicial. As pointed out above, Nelson's attorney did not object to the prosecutor's cross-examination of Dr. Harris, and the trial judge sustained all of the defense attorney's objections to the prosecutor's examination of Dr. Rothrock. Thus, Nelson's argument is raised for the first time on appeal, and we review it for plain error only. Criminal Rule 47(b); Evidence Rules 103(a)(1) and 103(d).

Evidence Rule 404(b) codifies the rule that evidence of a defendant's other crimes should not be admitted unless that evidence has probative value apart from demonstrating the defendant's general criminal propensities, and then only if the probative value of the evidence outweighs its potential for unfairly prejudicing the jury. However, Nelson affir-

matively relied on Dr. Harris's psychiatric evaluation to demonstrate that he lacked the culpable mental state required for first-degree murder and attempted murder (i.e., an intent to kill). When Nelson chose to raise this defense, the prosecutor was entitled to cross-examine Dr. Harris concerning the basis of his opinion. This cross-examination could properly include not only questions about the factors that Dr. Harris explicitly considered, but also questions about any other factors that a psychiatrist would reasonably rely on when evaluating Nelson's capacity to act with intent to kill.

Because the prosecutor's questions regarding the plane-bombing were pertinent to the jury's evaluation of Dr. Harris's expert opinion, these questions were within the proper scope of cross-examination under Evidence Rule 611(b) and they were not barred by Rule 404(b). Nelson's case is similar to the facts presented in *Jansen v. State*, 764 P.2d 308 (Alaska App.1988). Jansen was on trial for manslaughter and assault stemming from a motor vehicle accident. During the defense case, Jansen called a psychiatrist to testify that Jansen had no aggressive tendencies nor any impulse to act recklessly. The trial judge allowed the prosecuting attorney to cross-examine the defense psychiatrist by asking if the psychiatrist was aware of Jansen's two prior convictions for driving while intoxicated. *Jansen*, 764 P.2d at 309–310. On appeal, this court affirmed the trial court's decision:

> We agree ... that the two prior DWI convictions were relevant to [the psychiatrist's testimony] that there was nothing in Jansen's history ... which would support a finding of recklessness. By putting Jansen's *mens rea* directly in issue ... Jansen opened [the door] to cross-examination about the basis for [the psychiatrist's] opinion[.]
>
> ....
>
> By offering this evidence, Jansen opened the door for the state to impeach [Jansen's expert] by showing that he had either overlooked or disregarded significant evidence of past recklessness.

*Jansen*, 764 P.2d at 310, 311.

In Nelson's case, Dr. Harris testified that, in reaching his psychiatric diagnosis of Nel-

son, he had considered Nelson's history and background. The prosecutor then asked the significance of the doctor's own notation concerning a plane bombing. The doctor conceded that Nelson must have mentioned this incident to him, but that he had not pursued it. The doctor also conceded the obvious— that, if Nelson had planted a bomb in Pogany's father's airplane near the time of the shootings, this could have significance to Nelson's diagnosis and to the doctor's conclusion that Nelson lacked the capacity to act intentionally when he shot Pogany and Van Flein.

Because the plane-bombing was the type of datum that a psychiatrist would reasonably rely on in reaching a conclusion about Nelson's capacity to act with intent to kill, the prosecutor's questions were within the proper scope of cross-examination. When, as in Nelson's case, one party relies on the testimony of an expert witness, "the opposing party [is entitled] to challenge the expert's opinion by showing that it is based upon insufficient facts or that it overlooks significant factors germane to the opinion". *Jansen*, 764 P.2d at 310–11 n. 2.

█ Turning to the prosecutor's questioning of Dr. Rothrock, the portion of the proceedings quoted above (at pages 15–16 of this opinion) shows that the defense attorney did not object to the fact that Dr. Rothrock was asked about the plane bombing, but rather to the scope of Dr. Rothrock's answer. Judge Reese sustained the defense attorney's objection to the scope of Dr. Rothrock's answer. Judge Reese directed the prosecutor to limit her questions to Dr. Rothrock, and the prosecutor asked only two follow-up questions. In answer to these two questions, Dr. Rothrock stated that a plane-bombing would be the kind of event that he would find significant when evaluating a person. The prosecutor then moved on to other areas of inquiry. Again, we find no error.

█ As a separate argument on appeal, Nelson challenges another portion of the prosecutor's cross-examination of Dr. Harris. Nelson's contention involves the following exchange:

PROSECUTOR: ... Doctor, Alaska juries have disagreed with you in the past, haven't they?

DR. HARRIS: They have, I suppose.

PROSECUTOR: Do you recall the David Tugatuk (ph) case?

DR. HARRIS: No, I don't.

PROSECUTOR: You don't recall testifying that he had an active psychosis and a dissociative reaction which impaired his capacity to form intent?

DR. HARRIS: I already said I didn't— didn't recall the name.

PROSECUTOR: I'm trying to refresh your recollection. That doesn't refresh it?

DR. HARRIS: Well, I've seen a lot of different individuals, you know, that had dissociative reactions that killed, that had psychotic illnesses who killed. The question is always, okay, well, is this individual criminally responsible, or did he have a mental illness that interfered with that ability to formulate intent. And just the name David Tugatuk (ph)—is [that] it?

PROSECUTOR: Um-hum.

DR. HARRIS: Doesn't remind me right now of any particular case.

At this point, Nelson's attorney objected to the prosecutor's inquiry:

DEFENSE COUNSEL: Your Honor, if the prosecutor intends to go through varying cases on which this jury is not going to be given the total scenario of the case, what the jury instructions were, and what the issues were, I'm going to object to her suggesting what any other jury did insofar as dealing with Dr. Harris.

PROSECUTOR: Your Honor, I'll move on.

Nelson's attorney requested no further relief from the court.

We agree with Nelson that the prosecutor's questions were improper. The fact that other juries in other cases might not have accepted Dr. Harris's conclusions had no relevance to the jury's decision of Nelson's case; such cross-examination invited the jury to engage in unfounded speculation about those other cases and the tenor of Dr. Harris's testimony on those other occasions. Howev-

er, the prosecutor ceased this line of questioning when Nelson's attorney objected, and Nelson's attorney never asked the trial judge for a curative instruction, an admonition, a mistrial, or any other type of relief. We note that the prosecutor did not refer to this line of questioning during her summation to the jury.

■ Nelson makes a plain error argument. He asserts that, despite his attorney's failure to seek relief from the trial court, the trial judge committed plain error by allowing Nelson's case to proceed. Nelson does not specify whether he believes the trial judge should have declared a mistrial or simply given the jury a curative instruction. In either event, we find no plain error.

Nelson's attorney was the person charged in the first instance with assessing the effect of the challenged cross-examination on Nelson's trial. He apparently did not think that the challenged cross-examination was worth pursuing. Given the brevity of the improper cross-examination and the fact that the parties engaged in extensive examination of the substance of both Dr. Harris's and Dr. Rothrock's expert opinions, Nelson has failed to show that Judge Reese committed plain error when he allowed the trial to continue without further action regarding the objectionable cross-examination.

■ Nelson's next argument on appeal concerns a portion of the prosecutor's argument to the jury. At the end of her summation, the prosecutor said:

There are many, many reasons in this case, many facts from which you can find that Andrew Nelson acted intentionally, and why you should find Andrew Nelson acted intentionally. [Defense counsel] raised another reason. That reason is this: (Indiscernible) simple justice. Recall the testimony the night Sandra Pogany was killed. She was in this courthouse. Remember? Thomas Van Flein (indiscernible). She came here with him. She had plans to go to law school. She was going to pursue the legal profession. She walked in these halls, she went to the supreme court courtroom. She had expected justice, law, the courtroom to be

part of her life, part of her (indiscernible). Well, it's now part of her death. Because of Sandra Pogany's death, that's why we're here in the courtroom. That's why (indiscernible). Andrew Nelson chose Sandra Pogany's future for her. He wiped it out. Now it's your chance to decide his future. This is your chance to do justice in this case. Andrew Nelson knew he would pay a price for his actions. He put it out of his mind. The time has come, ladies and gentlemen. The time has come. The evidence in this case supports only two verdicts. Guilty of murder in the first degree, and guilty of murder—attempted murder in the first degree.

As Nelson points out, the prosecutor's argument can easily be construed as an improper exhortation to the jury to find that Nelson acted with intent to kill, not because of the facts and the applicable law, but because of the enormity of Nelson's actions. He claims on appeal that this segment of the prosecutor's summation denied him a fair trial.

However, Nelson's trial attorney did not object to the prosecutor's argument. Nelson must therefore demonstrate that the trial judge committed plain error by failing to declare a mistrial *sua sponte*.

■ Under the double jeopardy clause, a criminal defendant can not be retried following a mistrial unless (1) the defendant sought the mistrial, or (2) a mistrial was manifestly necessary. *Koehler v. State*, 519 P.2d 442, 448 (Alaska 1974); *Staael v. State*, 697 P.2d 1050, 1053 (Alaska App.1985). For this reason, trial judges must be cautious about declaring a mistrial when the defendant has not asked for one.

The challenged portion of the prosecutor's summation occurred at the end of lengthy, substantive arguments by both sides that detailed the evidence on the question of Nelson's intent. As can be seen from the quoted excerpt, the prosecutor ended her argument by again directing the jury's attention to the evidence. In context, we do not find that Judge Reese committed plain error when he failed to terminate Nelson's trial because of these few sentences in the prosecutor's argument. As this court stated in *March v. State*, 859 P.2d 714 (Alaska App.1993),

Here, because [the defendant] did not request a mistrial, declaration of a mistrial would have violated his double jeopardy right absent an independent basis for concluding that there was a "manifest necessity" for a mistrial. *Koehler*, 519 P.2d at 448; *Browning v. State*, 707 P.2d 266, 269 (Alaska App.1985). The record in this case does not disclose the "very extraordinary and striking circumstances" under which a mistrial may be declared without the defendant's consent. *Lewis v. State*, 452 P.2d 892, 896 (Alaska 1969). We find no error in the court's failure to declare a mistrial *sua·sponte*.

*March*, 859 P.2d at 717.

■ Nelson's final attack on his conviction involves the wording used by the prosecutor and the two expert witnesses, Dr. Harris and Dr. Rothrock, in their discussions relating to whether Nelson acted with an intent to kill. At various points in the examination of these witnesses, both the prosecutor and the witnesses themselves referred to the issue as whether Nelson had the mental capacity to intentionally perform an act (or variations of this phrasing). Nelson points out that this phrasing confuses the criminal code's discrete concepts of (1) knowingly performing an act and (2) intending an act to have a particular result. Under the terminology used by the criminal code, "knowingly" refers to conduct or to circumstances, while "intentionally" refers to results. *See* AS 11.81.-900(a)(1) and 11.81.900(a)(2).[5] Nelson correctly notes that the issue at his trial was not whether he "intentionally" (that is, knowingly) fired the gun at Pogany and Van Flein, but, rather, whether he intended to kill them when he fired the gun.

5. Compare *Neitzel v. State*, 655 P.2d 325, 332–34 (Alaska App.1982), where this court concluded that, when the legislature used the phrase "intentionally performs an act" in the former second-degree murder statute, the legislature really meant "knowingly performs an act".

6. For example, Nelson's attorney elicited the following answer from Dr. Harris during direct examination:
    DEFENSE COUNSEL: What was your purpose in coming into this case and in seeing Mr. Nelson?

Nelson's trial attorney did not object to the phrasing of either the prosecutor's questions or the expert witnesses' answers. In fact, defense counsel himself elicited similar phrasing during his direct examination of Dr. Harris.[6] Thus, we review Nelson's claim for plain error only.

From our review of the record, we do not think that the jury was confused by the wording of the prosecutor's questions and the experts' answers. During their closing arguments, both prosecutor and defense counsel told the jury that the issue before them was whether Nelson intended to cause the death of Pogany and Van Flein. Moreover, the jury instructions clearly asked the jurors to decide the pertinent question: whether Nelson acted with intent to kill when he shot Pogany and Van Flein.

Judge Reese told the jurors that, in order to find Nelson guilty of the first-degree murder of Pogany, they had to find that Nelson "intended to cause the death of another person" when he caused the death of Sandra Pogany. Judge Reese also told the jurors that, in order to find Nelson guilty of the attempted first-degree murder of Van Flein, the jurors had to find that Nelson "intended to cause the death of another" when he shot Thomas Van Flein. The court then gave the jury the following instruction defining the culpable mental state of "intentionally":

A person acts "intentionally" with respect to a result described by a provision of law defining an offense when the person's conscious objective is to cause that result. "Conscious objective" means purpose. Thus, a defendant acts with the intent to kill when it is his conscious objective or purpose to kill at the time he does

. . . .
    DR. HARRIS: ... My purpose was to perform a psychiatric evaluation of Mr. Nelson, and to establish, if appropriate, any diagnosis of any mental disorder; and, furthermore, to answer questions as to whether any such mental disorder ... interfered with Mr. Nelson's ability to intend an act.
Later during the direct examination, Dr. Harris referred to Nelson's ability to "think through a course of action and know what's going on".

the acts which result in death or serious physical injury.

In sum, we find no error.

We turn now to Nelson's claim that his sentence is excessive. Both first-degree murder and attempted murder are unclassified felonies with maximum penalties of 99 years' imprisonment. AS 11.41.100(b) and AS 12.55.125(a); AS 11.31.100(d)(1) and AS 12.55.125(b). Judge Reese sentenced Nelson to the maximum term for each crime and ran these sentences consecutively, for a total of 198 years to serve.

Nelson was a first felony offender; in fact, he had no criminal history of any kind. Nelson contends that he has, in effect, received a sentence of life imprisonment without parole, and he argues that the record fails to support such a sentence.

■ We first consider Nelson's claims that he should not have been sentenced to the maximum term for either the murder or the attempted murder. Alaska law requires that, before a defendant receives the maximum sentence for a crime, he or she must be properly classified as a "worst offender". A finding of "worst offender" can be premised either upon the defendant's criminal history or the seriousness of the defendant's present crimes. *Capwell v. State*, 823 P.2d 1250, 1256 (Alaska App.1991).

Judge Reese never explicitly found that Nelson was a worst offender. However, the sentencing record plainly reveals that Judge Reese viewed Nelson as a defendant who had committed particularly serious crimes and whose prospects for rehabilitation were guarded.

■ Viewed in the light most favorable to upholding Judge Reese's sentencing decision, the evidence shows that Nelson committed premeditated, deliberate murder. Nelson obtained a handgun, purchased ammunition, practiced shooting the gun, went in search of Pogany, waited by her truck for hours, and then shot her and her companion Van Flein when they returned to the vehicle. Nelson consciously weighed his potential criminal liability and decided that it was worth spending 30 to 40 years in prison in exchange for taking his victims' lives.

Nelson's crime would have been first-degree murder even under the common law's more restrictive definition of this crime. This alone would have justified Judge Reese in finding Nelson's murder of Pogany to be among the most serious first-degree murders and to merit the 99–year maximum sentence. *George v. State*, 836 P.2d 960, 963 (Alaska App.1992); *Riley v. State*, 720 P.2d 951, 952 n. 1 (Alaska App.1986).

■ With regard to the attempted murder of Van Flein, the evidence supports the conclusions that Nelson intended to kill Van Flein along with Pogany, and that Nelson premeditated Van Flein's death as he watched Pogany and Van Flein inside the truck. Considering the number of shots Nelson fired into the cab of the truck, Van Flein's survival is a fortuity. Van Flein was struck four times. He still carries two of the bullets (in his neck and shoulder), and he has suffered long-term impairment of his right arm and hand. Judge Reese could properly find that Nelson's assault on Van Flein was among the worst attempted murders and that Nelson should receive the maximum term for this crime as well. We do not find this sentence clearly mistaken. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

■ A more troublesome issue is raised by Judge Reese's decision to make these sentences totally consecutive. Before a judge imposes consecutive sentences that exceed the maximum sentence for the defendant's most serious crime, the judge must find that a sentence of that length is necessary to protect the public. *Mutschler v. State*, 560 P.2d 377, 380–81 (Alaska 1977); *George v. State*, 836 P.2d at 963–64.

Judge Reese did not refer to the *Mutschler* rule in his sentencing remarks. He did explain that he believed consecutive sentences were necessary to reflect Nelson's violation of the person of each victim. See *Cooper v. State*, 595 P.2d 648 (Alaska 1979), a case involving one assaultive act directed at three victims; the supreme court approved a composite sentence greater than the maximum term for any single count of assault. However, Judge Reese did not otherwise ad-

dress his decision to make Nelson's terms of imprisonment consecutive.

The Alaska Supreme Court and this court have occasionally dispensed with the requirement of an express finding of necessity when the sentencing record has unequivocally established that the defendant posed an extreme danger of future misconduct and lacked potential for rehabilitation. *See, e.g., Neal v. State,* 628 P.2d 19, 21 (Alaska 1981); *Collins v. State,* 778 P.2d 1171, 1177–78 (Alaska App.1989) (Singleton, J., concurring); *Krukoff v. State,* 702 P.2d 664, 666 (Alaska App.1985). The State relies on this line of cases, asserting that Judge Reese implicitly made the finding required to justify the 198–year sentence.

Judge Reese stated that he believed it would be difficult to treat the underlying causes of Nelson's antisocial behavior; he further believed that one of the main impediments to Nelson's rehabilitation was Nelson's lack of awareness of the extent of his problem and concomitant lack of resolve to obtain and successfully complete treatment. Judge Reese declared:

> Certainly we want hope, and we don't want to lose a member of society, especially someone with as much to offer as Andy Nelson has. So much promise. But I don't really feel good about [his] rehabilitative potential[.] I'm just simply not convinced that that is real. I heard nothing about any real effort toward obtaining therapy, obtaining an answer to this problem[.]
>
> ....
>
> I listened very hard for remorse, which would seem to be a window out of this[, but] I heard only passing comments from Mr. Nelson in his allocution about remorse. I have trouble accepting it as genuine.... [Y]our words were about the terrible position you're in, and how confusing it is, and how you can't think of anything else to say—which, I think, means, "How can I talk my way out of this?" ... I find nothing in [your remarks] that showed me that you have felt the horror of what you have done.

Later in his remarks, Judge Reese addressed the sentencing criterion of isolating Nelson to protect the public:

> Looking ... at the isolation issue, I think the issue there is dangerousness— ... whether or not Mr. Nelson is dangerous. And I have to admit it's not clear to me. I really want to say, well, you're not dangerous now, you're okay now, but I can't find that. I don't know. I am disturbed at the way you've presented yourself—by not reacting to the things that everybody else seemed to react to so much, and that I reacted to.
>
> You were involved in the airplane bombing. I think it's more likely than not that you were involved in putting sugar in the airplane, which should only be considered an attempted murder. The time involved in preparing for and executing and following up these crimes is time you spent carefully and analytically doing something. This is the kind of a person you are. I see no difference today in that. So, I have trouble convincing myself that you're not presently dangerous.

Despite this pessimism, however, Judge Reese also apparently believed that Nelson should have a chance to obtain parole release at some point during his imprisonment. Judge Reese stated that he wanted parole to be "an opportunity to soften [the sentence], an opportunity for hope":

> I do not think that it's appropriate to restrict your eligibility for parole.... I think our parole board does a pretty good job, and they look at things pretty carefully.... I have no reason to doubt the ability of the Alaska Parole Board to analyze your situation appropriately when the time comes. I do recommend that, when that time comes, ... [the parole board members] look carefully and hopefully at your degree of success in dealing with the psychological issues here, and that you've been able to get beyond the trap of your intellectual skills so that you're able to get in touch with what's really going on, and perhaps ... find success in changing a very difficult-to-change part of your personality. I think that's the key, and I would direct the parole board's attention to

that and recommend that they pay particular attention to that.

As Judge Reese indicated in his sentencing remarks, Nelson's actions during the summer of 1990 demonstrate good reason to believe that he presents a serious and long-term danger to society. His acts of stalking and lying in ambush for Ms. Pogany on the night of the murder put his conduct among the worst first-degree murders. Moreover, before he attacked Pogany and Van Flein, Nelson had actively considered killing Ms. Pogany's mother simply so that Ms. Pogany would feel the pain of loss. Additionally, Nelson had earlier disabled and eventually bombed Ms. Pogany's father's airplane in yet another apparent attempt to take revenge on Ms. Pogany. These factors move Nelson's actions well beyond the realm of an ordinary crime of passion. As Judge Reese found, Nelson's actions as a whole demonstrate a marked coldness, a calculation, and a substantial disregard for the value of human life.

Nevertheless, Judge Reese's remarks concerning parole—particularly, Judge Reese's expressed hope that parole eligibility might provide an incentive for Nelson's rehabilitation—seem to indicate that Judge Reese entertained a guarded expectation that Nelson might be rehabilitated some day. Given this ambiguity in Judge Reese's sentencing remarks, we can not overlook Judge Reese's failure to make an explicit *Mutschler* finding.

Therefore, while we affirm Nelson's individual 99-year sentences for the crimes of first-degree murder and attempted murder, we remand this case to allow the superior court to address the *Mutschler* requirement. If, on remand, Judge Reese again decides to run the two sentences consecutively, either in whole or in part, he must make the appropriate finding under *Mutschler* (that the composite sentence is necessary to protect the public).[7]

Nelson's convictions for first-degree murder and attempted murder are **AFFIRMED.**

His 99-year terms of imprisonment for these two crimes are likewise **AFFIRMED,** but this case is **REMANDED** for *Mutschler* findings.

---

7. On remand, the parties may wish to address the calculation of Nelson's parole eligibility. Under AS 33.16.100(d), a prisoner sentenced for murder or attempted murder must serve "at least one-third of the period of confinement imposed" before becoming eligible for parole. The statute does not specify whether this one-third is calculated strictly according to the number of days the prisoner actually spends in confinement, or whether the prisoner's accrued good time credit counts toward service of the required one-third of the period of confinement.