**Dana Lee HILBISH, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–4866.**

Court of Appeals of Alaska.

March 10, 1995.

Mary P. Treiber, Chenhall & Treiber, Ketchikan, and Brant McGee, Public Advocate, Anchorage, for appellant.

Kenneth M. Rosenstein, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

BRYNER, Chief Judge.

Dana L. Hilbish appeals her conviction of first-degree murder and two counts of tampering with evidence. She argues that the

superior court erred in denying her motion to suppress evidence, in allowing the victim's skull to be used as evidence at trial, in instructing the jury on reasonable doubt and failing to instruct on self-defense and heat of passion, and in denying a motion for judgment of acquittal based on insufficient evidence. We affirm.

## FACTS

Charles Dalby disappeared from Ketchikan on or about June 3, 1991; approximately ten weeks later, on August 13, Dalby's decomposed body was found under a green tarp in the lower west yard of his house at 142 Austin Street. Dalby had been shot twice in the head. Hilbish was eventually charged and tried for the shooting. The evidence at her trial disclosed the following circumstances:

In 1991, Dalby lived with Dana Hilbish and their four young daughters at 142 Austin Street in Ketchikan. Although Dalby and Hilbish had enjoyed a long relationship, they had never married. Dalby worked as a diesel mechanic at a logging camp in Thorne Bay. In the spring of 1991, while Dalby was at camp, Hilbish became involved with another man; Dalby found out about it. He flew from Thorne Bay to Ketchikan on May 30 to resolve the situation.

Because Dalby did not have the money to pay for the flight from Thorne Bay, he told the gate agent at Ketchikan, Connie Smith, that he would return later that day with a check. After Dalby failed to return with the payment, Smith called Dalby the next day. Hilbish answered the phone. When Smith identified herself and asked for Dalby, Hilbish told Smith, "The son-of-a-bitch is not here," and immediately hung up.

On May 31, Dalby called Pastor Bill White and asked him to counsel Dalby and Hilbish, in order to strengthen their relationship and keep their family together. Dalby told the pastor that Hilbish was seeing someone else. When White suggested that marriage would give them something to build on, Dalby responded in a positive manner.

Dalby called his mother on June 1, 1991, and asked her to talk to Hilbish about Hilbish's affair. Dalby told his mother that he and Hilbish had spoken to a minister, who had suggested marriage. Upon telling his mother this, Dalby gave the telephone to Hilbish. While speaking with Dalby's mother, Hilbish said that she loved another man and did not want a commitment. Hilbish also said that she did not love Dalby; that she "hated him so much she didn't care what happened to him."

The next day, June 2, Thomas Friesen, an employee at the Derby Room Tavern, saw Dalby come into the bar at around 4:30 in the afternoon, "very angry," looking for a man he claimed was spending a lot of time with his wife. Friesen, attempting to "defuse the situation," told Dalby that his behavior was inappropriate and suggested that Dalby leave. Dalby left, but returned a half hour later and apologized to Friesen and the bar patrons for his behavior.

That same day, Benita See, a friend of Hilbish's, called Hilbish to confirm her plans to stay at the house for two weeks. Hilbish said that See could stay at the house beginning June 4, since Dalby would be returning to Thorne Bay on that day. Hilbish told See that she was seeing another man, had told Dalby about it, and had asked him to move out.

At about 1:30 p.m. on June 3, 1991, Dalby returned to the Derby Bar; he again apologized for his conduct the previous day. He then had a soft drink.

No other witness saw Dalby alive after that. Mike McColley lived within 100 feet of Dalby and Hilbish's house. In early June of 1991, McColley heard a loud argument at Dalby's house between two men who were in the yard: "[I]t was, 'stay away from my daughter or my wife.' One man was saying. And the other man said ... something to the effect, 'You don't know me. I'll kill you.'" McColley said that fifteen to twenty minutes later he heard a gunshot.

Smith, the airline gate agent, telephoned Dalby's house again on June 3 to ask about the airfare Dalby owed. She spoke with Hilbish, who, "at that time, ... was screaming; she was very rude, vulgar. She said

that the son-of-a-bitch had left town." Dalby never paid the airfare.

Benita See arrived to stay at Hilbish's house on June 4, as she had previously arranged to do. Dalby was not there. Hilbish told See that Dalby had moved out the day before because See was arriving. Hilbish also told See to be careful about the carpet, because she and Dalby had just cleaned it. See stored some boxes on the porch at Hilbish's house. During her visit, See noticed a smell coming from the porch and a large number of flies. Hilbish told See that she did not know where the odor was coming from, and that it might be a dead fish or cat.

Sonja Powers, Dalby's adult daughter by a prior relationship, lived in Kasaan with her husband, Adrian Powers, and their children. Sonja and Adrian would stay at the house with Dalby and Hilbish when they came to Ketchikan. During the first week of June, Adrian visited the house. Hilbish told him that Dalby had moved to the YMCA or was fishing on the Bering Sea. Adrian noted that a .22 caliber handgun Dalby had kept above his bed was gone.

In mid-June, Sonja stayed at Hilbish's house for a night. Hilbish told Sonja that Dalby was fishing, either in Hawaii or on the Bering Sea. Sonja noticed a blanket on the end of the porch and that the end of the porch was blocked off. She commented on the stench coming from the area and the large number of flies. Hilbish told her that a cat or dog had crawled underneath the house and died. That evening, Sonja noticed that the .22 caliber handgun was no longer over the bed in Hilbish and Dalby's bedroom.

On See's birthday, June 16, Donny Bell and his friend, Joe Kuharich, stopped by Hilbish's house and noted the smell of rotting fish. Kuharich told Hilbish that he and Bell would clean up the fish. Hilbish told them "it wasn't necessary, not to worry about it."

On the Fourth-of-July weekend, Gary Lake went to Hilbish's residence to inquire where Dalby was, because Dalby was supposed to do some work on Lake's truck over the weekend. Hilbish told Lake that Dalby had been fired, "that she didn't know where he was, and that he was gone for good."

Then one of Dalby and Hilbish's children asked, "Daddy coming home?," to which Hilbish responded, "No, he [is] gone for good."

Ketchikan Police Officer Andrea Jacobson stopped by Hilbish's house on July 17 and 29. Jacobson did not see Dalby; when she asked Hilbish where Dalby was, Hilbish replied that he was "probably in Hawaii." Jacobson recalled seeing a tarp in the yard on at least one of her visits.

Brett Pearce, who lived across the street from Hilbish, noticed the tarp lying in Hilbish's yard sometime in July because one night, at around 10:30, he looked out his window and saw Hilbish next to the tarp. Hilbish "looked up ... kind of hysterically." As soon as Hilbish saw Pearce watching her, she "just started picking up sticks off the ground, like she was gardening." In late July, Pearce and his wife started to notice the smell.

Steve Boehlert, paymaster of the mill that employed Dalby, stated that Hilbish came to the mill at the end of July to pick up Dalby's last paycheck. Boehlert told her that company policy required a signed authorization from the employee. Hilbish told him that Dalby was "south," and she left.

On August 2, 1991, Hilbish spoke to Brett Pearce and his wife and asked Pearce to drive her back to the mill, so that she could pick up Dalby's paycheck. The Pearces asked where Dalby was; Hilbish answered that he had left and gone to Hawaii. Pearce drove Hilbish to the mill. On the way to the mill, Hilbish said that she and Dalby had argued because Dalby suspected her of having an affair with another man and that Dalby had then gone to Hawaii. Hilbish also told Pearce that she had forged a letter with Dalby's signature and was hoping to get his paycheck.

Upon arrival, she told Boehlert that Dalby was still "south," and gave Boehlert a note stating:

I, Charles Dalby, release my paycheck and belongings from Ketchikan Pulp Company to Dana Hilbish. Thank you. [Signed] Charles E. Dalby

Boehlert referred Hilbish to Michael Barron, the personnel director for the mill; when

Barron checked the signature against signatures on file in the personnel office, it did not appear to match Dalby's. Barron told Hilbish that he could not release Dalby's check without a notarized signature. Hilbish told him that it was hard for her to contact Dalby and that she would have to go through a friend of a friend to get word to Dalby. She left without the money and did not return.

Late in the day on August 12, 1991, the Powers family—Sonja, Adrian and their children—stopped at Hilbish's house on their way from Kasaan to Oregon. The Powers asked Hilbish if they could camp in the front yard; Hilbish agreed, and she helped Sonja set up tents. Sonja noticed that a green tarp she had previously left at the house was on the ground near the basement in the lower west yard, covering a large item. She also noticed a strong odor coming from the direction of the tarp.

That evening, Hilbish saw the children playing on the tarp and told them to get off. Sonja asked about the tarp, but Hilbish did not want to talk about it. The following day was hot; the odor from the tarp grew much worse. Sonja asked the children what was there, and they told her "something dead." Sonja told the children to stay away from it. She decided to call the police.

Sonja told the dispatcher that she was Hilbish's neighbor and that "there's something in 142 Austin's lower yard in a tarp, it might be deer or fish or something. But it's big...." Officer Jacobson arrived at the house shortly after noon and spoke with Hilbish. Hilbish walked Jacobson to the source of the smell, the green tarp in the lower west yard. Hilbish told the officer that the tarp belonged to her landlord, Victor Klose, who had taken some fish out of the basement freezer and had left it in the yard and forgotten about it. After glancing under the edge of the tarp and seeing "a white goo, sort of jelly-like, and with maggots and worms and things crawling all through it," Jacobson asked how to contact Klose. Hilbish told her that Klose was out of town and could not be reached. Jacobson said that the tarp could not be left the way it was, and Hilbish volunteered to "bury it tonight when it's cooler."

Later that day, as Sonja Powers drove her husband, Adrian, from town to Hilbish's house, Sonja mentioned the tarp and confided that she thought her father might be hidden underneath it. Adrian did not believe what Sonja was saying, and the couple became involved in an argument as they sat in their car in front of the house. A neighbor evidently heard the argument and called the police, reporting a domestic assault.

Sonja and Adrian entered the house and Sonja asked Hilbish what was in the tarp. Hilbish told her, "It's nothing. None of your business." Sonja and Adrian went out to the yard, where Sonja tried to convince Adrian to look under the tarp. Adrian refused and they began arguing again. At 7:16 p.m., Sergeant Charles Mallott arrived in response to the reported domestic assault. After being assured by the Powers that there had been no assault, Mallott left.

Angered that no one took her seriously, Sonja left Adrian, looked under the tarp and saw "[a] bunch of white slime stuff." She started trembling and decided to go to a local bar for some tequila. As she headed back to the house, Sonja resolved to look under the tarp more carefully. This time, she saw what looked like a pair of Levi's.

Now convinced that her father was under the tarp, Sonja returned to the house and confronted Hilbish. Hilbish told Sonja that the tarp was "none of your fucking business." When Sonja threatened to call the police, a scuffle ensued: Hilbish bit Sonja's finger; Sonja bit Hilbish's cheek. Adrian intervened, attempting to grab Sonja; he received a scratch on the neck. Someone called 911.

Corporal Jerry Seufert arrived at approximately 8:00 p.m. He encountered Sonja, who appeared to be moderately intoxicated and who made several comments about a tarp in the yard. She explained that Dalby had been missing for some time and that she suspected that he might be under the tarp. Sonja walked Seufert to the tarp, lifted up its corner, and began yelling, "Oh, my God. It's my daddy." Seufert looked under the tarp and saw "what appeared to be a cloth of some sort." He returned with Sonja to the main yard, in order to escape the odor.

Meanwhile, Sergeant Mallott had also returned to the house; Seufert told Mallott what had happened. As Hilbish and Sonja attempted to explain the situation to Mallott, Mallott activated a portable tape recorder that he carried on his person. Hilbish insisted that Sonja had been "trying to trash my house again," and told Mallott, "This is not between me and her; this is between the two of them.... As far as I'm concerned, she didn't lay a hand on me, okay?" As Mallott began to collect information, Sonja said to Hilbish, "We're going to look in the tarp now, Dana." Hilbish replied, "Go ahead, why don't we?"

Mallott accompanied Sonja back to the tarp and lifted the edge. Mallott recognized what he saw as human remains. After instructing Seufert to secure the area, Mallott returned to the house, completed his investigation of the domestic dispute, and arrested Sonja in connection with that incident. He then proceeded to have the tarp seized and removed from the yard. Later that night, he received a search warrant authorizing a complete examination of the tarp's contents.

The following day, Mallott spoke with Hilbish about Dalby. Hilbish said she did not know where Dalby was, but she thought that he may have gone to Hawaii. She told Mallott that she last saw Dalby around the first of June. At that time she had asked him to leave and he had done so. When asked if there were any firearms in her house, Hilbish stated that there had never been any firearms in their residence.

By comparing postmortem dental and skeletal x-rays of the remains in the tarp with Dalby's dental and medical records, the police subsequently confirmed that the remains were Dalby's. A forensic pathologist performed an autopsy on the remains. There were two bullet holes in the skull. Two .22 caliber bullets were discovered inside it. One bullet had entered just above the right brow, and the other "about where the sideburns would be." Another partially deformed bullet was discovered in the area of the torso; its point of entry could not be determined. From the generations of flies on Dalby's body, a forensic entomologist estimated that Dalby had been dead approximately ten weeks before his body was discovered and seized.

The police conducted a thorough search of Hilbish's house and yard. Although the police found no gun, they did find nineteen .22 caliber bullets in a bathroom cabinet. In the living room, the police found "quite a bit" of blood spattered on the south wall, the stereo cabinet, the television cabinet, the lamp shade, and a drop on the windowsill of the south wall. Above the couch was a three-inch long elongated drop of blood that looked as if "it had dripped straight down on the wall." Someone had apparently attempted to wipe the wall clean. When questioned about the blood spatter, Hilbish explained that one of her daughters had cut her finger and that Hilbish had tried to clean it off the walls with "409" cleaner.

Luminal testing on the living room carpet revealed the presence of blood; efforts had apparently been made to wash it from the carpet. There was also a very strong luminal reaction on the couch. A stained area was visible on the couch; the foam cushion was examined and found to be blood soaked. Pooled blood was discovered on the underside of the couch. DNA testing established that the blood was Dalby's to "a certainty of over 99.5 percent."

The state filed charges of murder and tampering with evidence against Hilbish in April of 1992. A month or two later, a carpenter working on Hilbish's house removed the bathtub and found a box of .22 caliber magnum shells hidden in the underlying plumbing. FBI testing revealed one of Hilbish's fingerprints on the inside of the ammunition box. Further testing established that the bullets recovered from Dalby's skull either came from the box of ammunition found under the tub or from another box of ammunition manufactured by the same company on the same day.

Hilbish and Dalby's seven-year-old daughter, Mary Dalby, confirmed that her father kept a handgun and bullets in the house. Mary knew the difference between a toy gun and a real gun and that her father's gun was real. She stated that the gun and bullets were kept on a shelf above her parents' bed

and the bullets were in a plastic yellow box. Mary identified the box that had been found under the tub as her father's.

## SUPPRESSION

Prior to trial, Hilbish filed a motion to suppress evidence stemming from Mallott's warrantless search of the tarp in her yard. The state responded, arguing that Mallott's lifting of the tarp and observation of its contents were permissible under a variety of theories. The superior court denied Hilbish's motion, finding Mallott's warrantless inspection of the tarp sustainable on three alternative grounds: (1) that Mallott acted upon consent given by Sonja Powers; (2) that his actions were justified by exigent circumstances; and (3) that Dalby's body inevitably would have been discovered. On appeal, Hilbish challenges the superior court's ruling as to each of these grounds. Our review of the record convinces us that the superior court correctly concluded that Mallott acted with Sonja Powers' consent; accordingly, we need consider no other theory.

Trial court factual findings concerning the validity of a warrantless search are reversible only for clear error. *Fox v. State*, 825 P.2d 938, 939 (Alaska App.1992); *State v. Bianchi*, 761 P.2d 127, 129 (Alaska App. 1988). Whether the facts, as found by the trial court, constitute an illegal warrantless search is a question of law upon which this court is entitled to make an independent evaluation. *Wilburn v. State*, 816 P.2d 907, 911 (Alaska App.1991).

"A warrantless ... [search] is *per se* unreasonable and violative of the state and federal constitutions unless it falls within one of the limited exceptions to the warrant requirement." *Harrison v. State*, 860 P.2d 1280, 1283 (Alaska App.1993) (citations omitted); *see also Woods & Rohde, Inc. v. State Dep't of Labor*, 565 P.2d 138, 149 (Alaska 1977). Since no warrant was obtained prior to Mallott's looking under the tarp, the state bore the burden of proving that this search was reasonable. *Bell v. State*, 519 P.2d 804, 806 (Alaska 1974).

Consent to search given by a person with authority to consent has long been recognized as one of the exceptions that can justify a warrantless search. *Schikora v. State*, 652 P.2d 473, 476 (Alaska App.1982). A person may consent to a search if that person has joint access to or control of the place to be searched. *Phillips v. State*, 625 P.2d 816, 817–18 n. 5 (Alaska 1980) (citing *Robinson v. State*, 578 P.2d 141, 144–45 (Alaska 1978)). Actual authority to consent is not required, so long as the person has the apparent authority to consent. *Nix v. State*, 621 P.2d 1347, 1349 (Alaska 1981). The police cannot, however, proceed on apparent consent without inquiry in ambiguous circumstances. Nor can they proceed based on the consenting party's unreasonable assertions of authority. *Id.* at 1350. Nevertheless, when a "guest is more than a casual visitor and 'ha[s] the run of the house,' [the guest's] lesser interest in the premises is sufficient to render that limited consent effective." *Id.* at 1350 (quoting 2 Wayne R. LaFave, *Search and Seizure* § 8.5(e), at 759 (1978)).

Here, it is undisputed that Mallott lifted and peered into the tarp with Sonja Powers' actual consent. The issue in dispute is whether Powers had either actual or apparent authority to give her consent. The record establishes that Hilbish kept the tarp in open view in her yard. As Dalby's daughter, Sonja frequently visited Hilbish and stayed at Hilbish's house. On August 13, 1991, Sonja was staying there with her husband and children. The Powers family was camped in Hilbish's yard and had the run of the area. In fact, the children had earlier played on and about the tarp. The tarp itself belonged to Sonja; she had left it with Hilbish on an earlier visit. In speaking with the police, both Sonja and Adrian referred to the tarp as "my tarp."

Given these circumstances, the superior court characterized Sonja Powers as a temporary occupant of Hilbish's residence who had actual authority over the portion of the yard examined by Mallott. In the superior court's view, the yard was "clearly not [Hilbish's] 'exclusive personal domain.'" This finding is not clearly erroneous.

Hilbish nevertheless maintains that, prior to the search, she had plainly revoked Sonja's authority to consent; Hilbish argues that, in the course of her altercation with Sonja and their ensuing contact with the police officers who had been summoned to the scene, Hilbish made it clear that Sonja was no longer a welcome visitor at her house. However, Hilbish's own recorded comments to the police belie this assertion. As Hilbish stated in Mallott's presence:

> You two are going to have to settle this somewhere else. Okay?
>
> . . . .
>
> This is not between me and her; this is between the two of them. She was trying to drive, okay? She would not give me the keys. . . . she would not listen. As far as I'm concerned, she didn't lay a hand on me, okay? That's not what it's all about.

These comments establish that Hilbish viewed the altercation as one between Sonja and Adrian Powers, not one between Sonja and herself. At no point in Mallott's recording of the incident did Hilbish expressly or implicitly tell Sonja or Adrian that they would no longer be welcome as guests. Even more significant is the fact that, immediately prior to Mallott's warrantless inspection of the tarp, Hilbish appears to have expressly authorized Sonja to allow the inspection. When Sonja told Hilbish, "We're going to look in the tarp now, Dana," Hilbish promptly replied, "Go ahead, why don't we?" [1]

■ The superior court considered and rejected Hilbish's claim of revoked authority to consent, finding: "While [Sonja's] 'authority' to fight with her husband, within the confines of the house, may have been revoked by Hilbish, her authority to access common areas on the premises had not been revoked." Because this finding is not clearly erroneous, the superior court could properly conclude that Sonja Powers had actual authority to consent to Mallott's search.[2] *Cf. Loper v. State*, 330 So.2d 265, 267 (Miss.1976) (person with access to the backyard "available for the common use of every occupant" could consent to the yard's search).

## DISPLAY OF SKULL AT TRIAL

■ Hilbish next argues that the trial court erred in permitting the state to display Dalby's skull during the trial. The skull—which had been cleaned of all tissue and was contained in a sealed and odorless plastic bag—was used to assist the jury in understanding the precise location of the gunshot wounds to Dalby's head. It did not go to the jury room during deliberations. Hilbish acknowledges that the skull was relevant on the issue for which it was admitted but claims that its probative value was out-

---

1. Mallott evidently did not actually hear Hilbish make this comment, a fact the superior court relied on in concluding that Mallott himself could not be deemed to have acted on the basis of Hilbish's consent. On appeal, the state disputes the correctness of the trial court's ruling on that issue. We need not decide the point. Assuming Mallott's failure to hear Hilbish's remark may be relevant on the issue of whether Mallott conducted the warrantless search pursuant to Hilbish's consent, Mallott's awareness of the remark (or, for that matter, Sonja's own awareness of it) can have no relevance on the issue of whether Sonja had actual authority to consent.

2. Hilbish raises a subsidiary claim that the superior court erred in ruling on her suppression motion without conducting an evidentiary hearing. We find no merit to this claim. The memorandum Hilbish filed in support of her motion to suppress did not request an evidentiary hearing. Although her reply memorandum noted the possibility that a hearing might prove necessary, it did not ask the court to schedule one. Subse-quently, Hilbish's counsel appeared at oral argument on the suppression motion and neither requested a hearing nor mentioned the need to present further evidence or information. Nor did Hilbish object below when the superior court ruled on the suppression motion without a hearing having been conducted.

An evidentiary hearing is required on a motion to suppress only "if the state and the defendant have opposing versions of the facts and the defendant's version is supportive of his allegation of an illegal search[.]" *Mattern v. State*, 500 P.2d 228, 231 (Alaska 1972). As evidenced by Hilbish's own reliance on police reports to support her suppression argument, as well as by her failure to file an affidavit contesting the additional facts set forth in the state's response to her motion, the primary dispute in this case does not involve the facts underlying Mallott's warrantless search, but rather the proper characterization and legal significance of those facts. Given the totality of the circumstances in this case, we find no error in the superior court's failure to conduct an evidentiary hearing.

weighed by unfair prejudice. Although conceding that the vast majority of cases uphold the admission of similar exhibits under like circumstances, Hilbish proposes that we adopt the rigorous standard of admission articulated by the Pennsylvania Supreme Court in *Commonwealth v. Chacko,* 480 Pa. 504, 391 A.2d 999 (1978). There, the court indicated that evidence "likely to inflame the passions of the jury" should be admitted only if essential to the prosecution's case. *Id.* 391 A.2d at 1000–01.

As the state correctly notes, however, the *Chacko* standard is at odds with Alaska Rule of Evidence 403, which specifies that relevant evidence is admissible when its probative value outweighs its potential for prejudice. This court has consistently applied A.R.E. 403 in passing on the admissibility of potentially gruesome exhibits. *See, e.g., Miller v. State,* 778 P.2d 593, 598 (Alaska App.1989); *Ridgely v. State,* 705 P.2d 924, 932 n. 5 (Alaska App.1985), *rev'd on other grounds,* 732 P.2d 550 (Alaska 1987); *Sheakley v. State,* 644 P.2d 864, 869–70 (Alaska App. 1982). Hilbish has advanced no cogent basis for abandoning the rule.

The trial court in this case found that Dalby's skull, as presented at trial, was not particularly gruesome—arguably less gruesome than available photographs might have been. The state argued that the skull's three-dimensionality gave the skull an advantage over photographs and would assist the jurors in understanding and evaluating the testimony of prosecution witnesses. After carefully balancing probative value against potential prejudicial impact, the trial court ruled the evidence admissible. Our review of the record does not persuade us that the

court abused its discretion in making this determination.

## INSTRUCTION ON REASONABLE DOUBT

■ Hilbish further claims that the trial court erred in instructing the jury on the meaning of "reasonable doubt." [3] In particular, Hilbish objects to language in the reasonable doubt instruction informing the jury that proof beyond a reasonable doubt requires "proof of such a convincing character that after careful consideration of all relevant facts and circumstances, you would be willing to rely and act upon it without hesitation in your important affairs." Hilbish protests that likening the decision on reasonable doubt in a criminal case to a decision a juror might make in ordinary life, even an important decision, unduly trivializes the reasonable doubt standard.

■ Hilbish did not object to the reasonable doubt instruction below, however, and she advances this claim for the first time on appeal. We thus review only for plain error: error that is both obvious and obviously prejudicial. *Martin v. State,* 664 P.2d 612, 618 (Alaska App.1983). The challenged instruction appears to be a correct statement of the law. *Davenport v. State,* 519 P.2d 452, 456 (Alaska 1974) (reasonable doubt could perhaps best be defined as "a doubt that would cause prudent men to hesitate before acting in matters of importance to themselves.") (quoting 2 Charles A. Wright, *Federal Practice and Procedure* § 500, at 342–43 (1969)); *see also* 1 Edward S. Devitt et al., *Federal Jury Practice and Instructions* § 12.10, at 354 (4th ed. 1992) (defining reasonable doubt

---

**3.** The reasonable doubt instruction given to Hilbish's jury read:

The presumption of innocence alone is sufficient to acquit a defendant unless and until you are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case. This last mentioned requirement that you be satisfied beyond a reasonable doubt of the defendant's guilt is what is called the burden of proof.

It is not required that the prosecution prove guilt beyond all possible doubt; for it is rarely possible to prove anything to an absolute cer-

tainty. Rather, the test is one of reasonable doubt. A reasonable doubt is a doubt based on reason and common sense, the kind of doubt that would cause a reasonable person to continue to hesitate in decisions concerning his or her important affairs.

Proof beyond a reasonable doubt must therefore be proof of such a convincing character that after careful consideration of all relevant facts and circumstances, you would be willing to rely and act upon it without hesitation in your important affairs. A defendant is never to be convicted on mere suspicion or conjecture.

in the context of a person's "most important" affairs).

Moreover, since the instruction was based on Alaska Criminal Pattern Jury Instruction 1.52—an instruction regularly given in Alaska criminal cases—it is difficult to understand how the wording Hilbish complains of could be deemed obvious error, even if Hilbish's argument persuaded us, in hindsight, that a more forcefully worded reasonable doubt instruction might have been appropriate.[4] We find no plain error.

## INSTRUCTIONS ON HEAT OF PASSION AND SELF-DEFENSE

In her next claim, Hilbish asserts that the trial court improperly denied her request for instructions on heat of passion and self-defense. Hilbish was entitled to heat of passion and self-defense instructions if there was some evidence to place these defenses in issue. See LaPierre v. State, 734 P.2d 997, 999 (Alaska App.1987). The "some evidence" requirement is not a stringent one:

> this standard is satisfied when [heat of passion or] self-defense has fairly been called into issue.... [A]n instruction [is] required if the evidence, when viewed in the light most favorable to the accused, might arguably lead a juror to entertain a reasonable doubt as to the defendant's guilt.

Id. at 1000 (quoting Paul v. State, 655 P.2d 772, 775 (Alaska App.1982)). "In applying the some evidence test, neither the credibility of conflicting witnesses nor the plausibility of the accused's version is considered. So long as some evidence is presented to support the defense, matters of credibility are

properly left for the jury." Id. (Citations omitted.)

The use of deadly force in self-defense is permissible when a person reasonably believes such force to be necessary to protect "against death, serious physical injury, kidnapping, [certain forms of] sexual assault ..., or robbery[.]" AS 11.81.335(a)(2). Heat of passion is an affirmative defense reducing first- or second-degree murder to manslaughter. AS 11.41.115(a). The defense applies when the defendant acts "in a heat of passion, before there [has] been a reasonable opportunity for the passion to cool, when the heat of passion resulted from a serious provocation by the intended victim." Id. " '[S]erious provocation' means conduct which is sufficient to excite an intense passion in a reasonable person in the defendant's situation," but does not include "insulting words, insulting gestures, or hearsay reports of conduct engaged in by the intended victim[.]" AS 11.41.115(f)(2).

In the present case, the evidence did show that Dalby, having learned about Hilbish's affair with another man, was at times angry and threatening in the days before his death. Yet these pre-event occurrences suggest nothing more than motive and a possible willingness on Dalby's part to use deadly force at some future time. None of the evidence concerning the circumstances surrounding the shooting itself supports the conclusion that Dalby's prior expressions of anger culminated in an actual use or threat of deadly force by Dalby, or that Dalby's killer acted in the reasonable belief that the use of deadly force in self-defense was necessary to protect against Dalby. By the same token, Dalby's preexisting anger does not in itself support a reasonable inference that Dalby's

---

**4.** Commonwealth v. Ferreira, 373 Mass. 116, 364 N.E.2d 1264 (1977), which Hilbish cites in support of her argument, is inapposite. That case actually criticized the examples the trial judge used to illustrate "important decisions": whether to leave school or get a job, to get married or stay single, or to buy a house or continue to rent. Id. 364 N.E.2d at 1272–73. Likewise, neither Dunn v. Perrin, 570 F.2d 21 (1st Cir.1978), nor United States v. Colon–Pagan, 1 F.3d 80 (1st Cir.1993), supports Hilbish's argument. The former case approved a definition likening reasonable doubt to doubt causing hesitation in "some

transaction of importance and seriousness," Dunn, 570 F.2d at 24, and the latter found plain error in an instruction that was not phrased in terms of only "important" affairs. Colon–Pagan, 1 F.3d at 81. In Dunn v. Perrin, the court merely noted that some cases had criticized instructions likening reasonable doubt to doubt causing hesitation in "some transaction of importance and seriousness," 570 F.2d at 24; in Colon–Pagan, the court found plain error in an instruction that was not phrased in terms of only "important" affairs. 1 F.3d at 81.

killer acted in a heat of passion after being seriously provoked by Dalby.

The testimony of Mike McColley, Hilbish's neighbor, indicated that an angry argument occurred outside Hilbish's house and that McColley thought he heard a gunshot fifteen or twenty minutes later. Viewing this testimony in Hilbish's favor, the jury could reasonably have concluded that the argument McColley overheard involved Dalby and the man with whom Hilbish had recently become involved. The jury could also have inferred that the argument occurred not long before the shooting. Yet nothing McColley heard suggests that Dalby was shot in self-defense; to the contrary, the substance and context of the statements overheard by McColley suggest that it was the other man who threatened Dalby. Specifically, as we have previously noted, McColley testified that he heard one man—presumably Dalby—say something like, "Stay away from my daughter or my wife," to which the other replied, "You don't know me. I'll kill you." Nor did McColley's testimony describe any conduct suggesting heat of passion brought on by serious provocation; as we have already indicated, the statutory definition of serious provocation expressly excludes insulting words and gestures.

Hilbish points out that Dalby's blood was spattered about the living room, "suggesting that he had traveled, while bleeding, around the room." She argues that this shows that Dalby was "in the presence of and engaged with his killer." Hilbish also points out that Dalby was much larger than she is and that no evidence shows that Dalby was alive when the head wounds were inflicted. Hilbish concludes that, viewing the evidence in her favor, the only logical inference is that "she acted in either self-defense or in fear, a recognized form of heat of passion."

But this argument misses the mark. One can certainly conjure scenarios involving self-defense or heat of passion that would arguably be consistent with the evidence at trial; in this sense, Hilbish can plausibly maintain that the evidence at trial does not rule out the possibility of self-defense or heat of passion. Dalby's size and weight, his periodic anger, and the blood spatters on the wall are all arguably compatible with self-defense or heat of passion. But the state was under no obligation to assume the burden of disproving self-defense until there was some evidence affirmatively suggesting that what might have happened actually did happen; nor was Hilbish entitled to maintain that she had met her burden of establishing heat of passion as an affirmative defense merely because the evidence at trial did not disprove it.

Here, much of the evidence Hilbish relies on to support her claims of self-defense and heat of passion—such as Dalby's size and the blood spatters on the wall—is essentially neutral, that is, merely compatible with a theory of self-defense or heat of passion. Other evidence—such as Dalby's earlier expressions of anger or his possible involvement in an argument outside Hilbish's house shortly before the shooting—are so remote in time, removed in circumstance, or both, as to have no material bearing on the crucial issues involved in a claim of self-defense or heat of passion: whether Dalby actually used or threatened deadly force at the time of the shooting, whether he was shot in defense against such force or threat, or whether he engaged in any act of serious provocation. Allowing the jury to consider self-defense or heat of passion could only have invited speculation as to possibilities that find no reasonable support in the evidence, even when the totality of the evidence is viewed in the light most favorable to Hilbish. Under these circumstances, the trial court did not abuse its discretion in denying instructions on self-defense and heat of passion.

## SUFFICIENCY OF EVIDENCE

Hilbish lastly contends that the circumstantial evidence presented at trial was insufficient to support her conviction for murder. However, the law "recognizes no categorical distinction between direct and circumstantial evidence." *State v. McDonald*, 872 P.2d 627, 653 (Alaska App.1994). We apply the same standard of sufficiency to circumstantial and direct evidence. *Willett v. State*, 836 P.2d 955, 957 (Alaska App.1992). Taking the evidence and inferences therefrom in the light most favorable to the state, we inquire whether fair-minded jurors exer-

cising reasonable judgment could find that the state met its burden of establishing the defendant's guilt beyond a reasonable doubt. *Dorman v. State*, 622 P.2d 448, 453 (Alaska 1981).

Applying this standard to the evidence in the present case, we find no deficiency. Though circumstantial, the evidence established that Hilbish had the motive, the means and the opportunity to commit the crime. Hilbish also had control over the premises where the crime was committed and over the murder weapon. Moreover, Hilbish's prediction to her friend Benita See that Dalby would be gone by June 4 could reasonably be interpreted as an indication of planning. In the aftermath of the shooting, Hilbish engaged in a pattern of conduct aimed at concealing the crime and made numerous statements arguably displaying her consciousness of guilt. Finally, the physical evidence gathered from Hilbish's home cemented a compelling link between Hilbish and the murder weapon.

 Viewing this evidence and the inferences to which it gives rise in the light most favorable to the state, a fair-minded juror could reasonably have concluded, beyond a reasonable doubt, that Hilbish had committed first-degree murder, either by intentionally shooting Dalby to death or by intentionally aiding another person in planning or commission of the murder.[5]

The convictions are AFFIRMED.

---

**5.** Hilbish objects that the jury was erroneously instructed on accomplice liability; in Hilbish's view, the evidence was insufficient to establish her guilt as an accomplice, even if it might have been sufficient to prove guilt as a principal. This argument lacks merit. Under the evidence, fair-minded jurors could reasonably have found beyond a reasonable doubt that if Hilbish was not a principal, then she must have been an accomplice—that is, that Dalby had been intentionally killed by Hilbish or by someone acting at her behest and with her active and intentional assistance. The distinction between an accomplice and a principal has long been abrogated, *see Miller v. State*, 866 P.2d 130, 137 (Alaska App. 1994), and when proof suffices to establish the defendant's guilt under either theory, the jury need not be unanimous in deciding whether the defendant acted as a principal or as an accomplice. *McDonald*, 872 P.2d at 655.