James Lorenzo FITTS, II, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7254.

Court of Appeals of Alaska.

May 25, 2001.

Douglas O. Moody, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

W.H. Hawley, Jr., Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

James Lorenzo Fitts appeals his conviction for first-degree robbery.[1] He contends that much of the evidence against him was obtained during an illegal search of his room. Fitts also contends that the judge who presided over his trial wrongfully prevented his attorney from asking certain questions of a government witness, questions that would have revealed a potential defense to the robbery charge. Finally, Fitts contends that the prosecuting attorney engaged in improper argument during his summation to the jury. For the reasons explained here, we affirm Fitts's conviction.

*Underlying facts*

In the early morning of November 9, 1997, a youth who identified himself as "J.D." called for a taxi. Cab driver Christian Eckman was dispatched to answer this call. Eckman picked up two youths, later identified as James Fitts and Mario Gonzalez–LeBaron. The two youths told Eckman to drive them to 5720 East Fourth Avenue. When they arrived at that address, Fitts pulled out a black semi-automatic pistol, pointed the gun at Eckman's head, and announced, "this is a fucking jack" [*i.e.*, a robbery].

Eckman struggled, but Fitts and Gonzalez subdued him by striking him some thirty to forty times. Eckman ultimately surrendered his bankroll: a $100 bill, three $20 bills, a $5 bill, and some $1 bills. Fitts and Gonzalez then ran off into some nearby woods.

When police officers arrived to investigate, they discovered Fitts's wallet in the back seat of the cab. Using the information in this wallet, the police contacted Fitts's mother, who gave the officers a telephone number to contact her son. This telephone number belonged to an apartment at 5701 Rocky Mountain Court, a couple of blocks from the scene of the robbery. The police went to this apartment, which was rented by Gonzalez's mother, Sarah LeBaron. After LeBaron allowed them to enter, the officers found Fitts and Gonzalez in an upstairs bedroom.

1. AS 11.41.500(a).

The officers arrested Fitts and Gonzalez, and they then asked Sarah LeBaron for permission to search the apartment. LeBaron signed a written consent-to-search form, and the police conducted a search of the bedroom where they had found Fitts and Gonzalez.

During that search, the officers opened a saxophone case belonging to Fitts. They found a loaded handgun hidden in the lining of the case. The officers also found Gonzalez's wallet in a bureau. This wallet contained $175 in cash, including a $100 bill and some $20 bills.

Meanwhile, the officers asked their dispatcher to contact Eckman and have him come to 5701 Rocky Mountain Court. When Eckman arrived, he positively identified Fitts as the robber who held the gun on him.

*The legality of the search of Fitts's room*

Following his indictment, Fitts asked the superior court to suppress the evidence found during the search of the bedroom. Fitts conceded that the residence was owned (actually, rented) by Mario Gonzalez's mother, Sarah LeBaron. Fitts further conceded that the police lawfully obtained her consent for the search. Nevertheless, Fitts claimed that LeBaron did not have the authority to consent to a search of the bedroom that he shared with LeBaron's son, Mario Gonzalez. Fitts asserted that he and Gonzalez were LeBaron's subtenants—that they each paid a monthly rent to LeBaron, and that the bedroom was their exclusive space within the house.

At an evidentiary hearing, both Fitts and LeBaron testified in support of these contentions. However, their testimony was at odds with the information that LeBaron gave the police on the night of the robbery. At that time, when the police questioned LeBaron about Fitts's status as a resident in her apartment, LeBaron told the officers that Fitts was staying in her son's bedroom for free. She also told the officers that she enjoyed complete access to every room in the house, including the bedroom shared by Fitts and her son. LeBaron further informed the police that she had had enough of Fitts's and Gonzalez's activities, and that she was about to kick them out.

On appeal, Fitts argues that the testimony presented at the evidentiary hearing, if believed, proved that LeBaron did not have the authority to consent to a search of Fitts's bedroom. Fitts relies on case law holding that landlords do not have the authority to consent to a search of a tenant's apartment.[2] Fitts argues that his situation is analogous to these cases because he was renting a private room within LeBaron's apartment.

■ We need not resolve this issue. Even if Sarah LeBaron did not actually have the authority to consent to a search of Fitts's bedroom, the search would still be valid if she had the *apparent* authority to consent to the search.[3] That is, the police could lawfully search Fitts's bedroom so long as they reasonably believed that LeBaron had the authority to authorize the search.[4] The test is whether the information available to the officers, viewed with reasonable caution, would have warranted the conclusion that LeBaron had authority over the premises to be searched.[5]

Even assuming that Fitts's and LeBaron's testimony at the evidentiary hearing was true in every respect (*i.e.*, even assuming that Fitts and Gonzalez were rent-paying subtenants in LeBaron's apartment, and that LeBaron had granted Fitts and Gonzalez exclusive control over the bedroom they occupied), the police were not aware of these facts when they asked for LeBaron's consent to search the apartment. The officers knew only what LeBaron had told them: that she was in control of the apartment, that Fitts was not paying rent, and that Fitts was staying there at her sufferance.

---

2. *See, e.g., State v. Carsey*, 59 Or.App. 225, 650 P.2d 987 (1982).

3. *See Hilbish v. State*, 891 P.2d 841, 848 (Alaska App.1995) ("Actual authority to consent is not required, so long as the person has the apparent authority to consent.").

4. *See Illinois v. Rodriguez*, 497 U.S. 177, 188–89, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148 (1990); *Nix v. State*, 621 P.2d 1347, 1349–1350 (Alaska 1981).

5. *See Rodriguez*, 497 U.S. at 188, 110 S.Ct. at 2801.

■ The "apparent authority" doctrine will not validate a consent search when the police unreasonably turn a blind eye to facts that would undermine a person's claim of authority over the property. The police can not rely on a consenting party's unreasonable assertions of authority, and, in ambiguous circumstances, they must inquire into the basis of the consenting party's authority.[6] But here the circumstances tended to support LeBaron's assertion of authority.

The bedroom was not set up as a separate apartment. Rather, it was simply one of the bedrooms in LeBaron's two—bedroom apartment. The main occupant of this bedroom was LeBaron's son, Mario Gonzalez. Gonzalez was sixteen years old—not an age where one would expect to find him in a landlord-tenant relationship with his mother. And Fitts was sleeping on a mattress on the floor of the bedroom, a circumstance that tended to corroborate LeBaron's assertion that Fitts was a guest who was staying there for free.

■ A person may consent to a search of premises or property if that person "generally [has] joint access or control for most purposes".[7] Given the information known to the police (LeBaron's statements and the surrounding circumstances), the police could reasonably conclude that LeBaron had this degree of authority over the bedroom, and that LeBaron therefore had the authority to consent to the contemplated search. Even assuming that the police were in error (*i.e.*, even assuming that LeBaron did not actually possess the requisite authority), the officers' search of the bedroom was still lawful under the doctrine of apparent authority.

■ Fitts argues that, even though the circumstances might have supported the conclusion that LeBaron had authority over the room, the police should have questioned Fitts and Gonzalez to get their view of this matter. Fitts contends that, instead of making a good-faith attempt to clarify who had authority over the room, the police "whisk[ed]" him and Gonzalez away so that they would not be available to protest when LeBaron stated that she had authority over the bedroom.

But Fitts and Gonzalez had just been arrested for armed robbery; the police were authorized to take them out of the house and transport them to a police station or to jail. There is no indication that the police treated Fitts and Gonzalez differently from other felony arrestees, much less that any different treatment stemmed from the police's desire to make sure that the boys would not be present to dispute LeBaron's consent to the search of the bedroom.

For these reasons, we hold that the officers' search of the bedroom was a valid consent search.

*The legality of the search of Fitts's saxophone case*

We have just concluded that the officers acted legally when they entered and searched Fitts's bedroom. But the ultimate question is whether the police acted legally when, during their search of the bedroom, the officers opened Fitts's saxophone case and discovered the handgun concealed inside it. This is a more difficult question.

When a guest brings a closed container into their host's home, the situation almost inevitably involves overlapping property and privacy interests. In *Ingram v. State*[8], this court held that a host had validly consented to the search of a guest's jacket and wallet— items which are normally considered personal to the owner. We relied heavily on the fact that the guest left these items in a common area of the house. But Fitts's appeal involves a closed (albeit unlocked) instrument case that was left in the bedroom that Fitts occupied.

Courts reach differing conclusions when presented with similar facts. Some courts follow the approach suggested by our *Ingram* decision: if a person leaves a closed container in an area that is jointly controlled by another, that other person can consent to

6. See *Hilbish*, 891 P.2d at 848.

7. *United States v. Matlock*, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 993 n. 7, 39 L.Ed.2d 242 (1974); see also *Robinson v. State*, 578 P.2d 141, 144–45 (Alaska 1978); *Bright v. State*, 826 P.2d 765, 772 (Alaska App.1992).

8. 703 P.2d 415, 424 (Alaska App.1985).

a search of the closed container, even when the container might be deemed personal to the owner. For instance, in *United States v. Davis*[9], the court held that one of the co-users of a footlocker could validly consent to a search of the entire footlocker, including closed containers that belonged to one of the other co-users. And in *People v. Sawyer*[10], the court held that a wife could validly consent to the search of her husband's gym bag that the husband had hidden in their barn.

On the other hand, some courts have refused to allow a host to consent to a search of a guest's belongings, even belongings left in a common area, when the belongings are especially personal to the guest. Thus, in *United States v. Salinas Cano*[11], the court held that the defendant's girlfriend could not validly consent to a search of the closed (but unlocked) suitcase that the defendant left in her apartment. In *State v. Evans*[12], the court held that a wife could not validly consent to the search of her husband's closed cuff link case that was found in a drawer to which she had joint access. In *United States v. Gilley*[13], the court held that a host could not consent to a search of a guest's closed travel bag, even though the bag was left in an area of the premises over which the host had joint control. And in *Krise v. State*[14], the court held that a male housemate could not validly consent to a search of a female housemate's purse, even though the purse

was found in a bathroom that they both shared.

■ Fitts's brief does not offer much help in resolving this issue, for Fitts does not present a separate argument concerning the saxophone case. Every time that Fitts mentions the saxophone case, it is only as an addendum to his argument that LeBaron could not consent to a search of the bedroom.[15]

Thus, the question of the saxophone case has no easy answer, and Fitts does not separately address this question. Besides the fact that Fitts has not briefed this question, we are hesitant to embark on a detailed analysis of this legal issue for two other reasons.

First, it appears that the police might reasonably have believed that the instrument case belonged to the other occupant of the room, Mario Gonzalez–LeBaron. At the evidentiary hearing, Fitts conceded that his name was not on the saxophone case and that "anybody looking at the case . . . in Mario's room could conclude [that] it might be Mario's case". If the police reasonably thought that the case belonged to Gonzalez, then the question arguably becomes whether a sixteen-year-old child who is living in his parent's home can validly assert an expectation that his parent will not consent to a search of his belongings. This issue has not been briefed.

**9.** 967 F.2d 84, 88–89 (2nd Cir.1992).

**10.** 135 A.D.2d 1083, 523 N.Y.S.2d 303, 304 (1987).

**11.** 959 F.2d 861, 864–65 (10th Cir.1992).

**12.** 45 Haw. 622, 372 P.2d 365, 372 (1962).

**13.** 608 F.Supp. 1065, 1069 (S.D.Ga.1985).

**14.** 746 N.E.2d 957, 967 (Ind.2001).

**15.** "Fitts had a high, and certainly reasonable, expectation of privacy in the room and his saxophone case." (Appellant's Opening Brief, page 14)

"Lebaron did not have mutual use of the bedroom for any purpose, let alone most purposes. Consequently, she did not have the authority to consent to a search of the bedroom or of the

saxophone case." (Appellant's Opening Brief, page 14)

"[T]he officer's conclusion that Lebaron had the authority to consent to a search of Fitts's bedroom and saxophone case is unreasonable. . . . Consequently, it was unreasonable to search the room, and certainly the saxophone case, without inquiring of Fitts and Gonzalez–Lebaron as to who had authority over the room and case. . . . Lebaron's comments regarding occasionally searching the bedroom do not provide the basis for a reasonable conclusion that she had authority to consent to a search of the room and the saxophone case." (Appellant's Opening Brief, page 17)

"Lebaron did not have the actual authority to search the saxophone case or the room." (Appellant's Opening Brief, page 18)

"The officers could have asked either Fitts or Gonzalez Lebaron who owned the saxophone case and who used the room, easily resolving [any] ambiguity [as to Sarah Lebaron's joint ac-

■ Second, even if we ultimately ruled that the gun should be suppressed, it does not appear that the introduction of the gun at Fitts's trial constituted reversible error. The State presented very strong evidence that Fitts was one of the robbers. Fitts's wallet was found in the back of the cab after the robbers fled. Moreover, shortly after the robbery, the cab driver identified Fitts as the robber who held the gun. Fitts's attorney did not dispute that Fitts had assaulted the cab driver. Fitts's only offered defense was that Fitts and Gonzalez were attempting to retrieve a $100 bill that the boys had given to the cab driver in exchange for the driver's help in obtaining some unspecified unlawful "pleasure". This was not a valid defense to a charge of robbery.[16]

In sum: Not only would we face considerable difficulty if we decided to resolve the legality of the search of the saxophone case without substantive help from the parties, but it further appears that our resolution of this issue would have no appreciable effect on the ultimate outcome of this litigation. For these reasons, we conclude that we should enforce our procedural rule: Fitts has waived the issue of the saxophone case by failing to adequately brief it.[17]

*The trial judge's restriction on the defense attorney's cross-examination of the cab driver*

As just explained, Fitts's primary defense argument was to suggest that he and Gonzalez had given $100 to the cab driver, Eckman, with the understanding that Eckman would help them obtain some unspecified illegal commodity or service—and that Fitts pulled a gun on Eckman when the deal went sour. During the defense cross-examination of Eckman, the defense attorney sought the trial judge's permission to ask Eckman whether Fitts and Gonzalez had asked him where they could purchase marijuana, and whether the boys had given him $100 to

purchase marijuana for them. The prosecutor objected that there was no evidentiary basis for these questions; he argued that if the defense attorney were allowed to ask them, the jurors might speculate that there was evidence to support the defense attorney's assertions, evidence that had been kept out of the trial.

When Superior Court Judge Larry D. Card asked the defense attorney whether he had a good-faith basis for his proposed questions, the defense attorney said that his proposed questions were based on conversations with his client. But when Judge Card asked the defense attorney whether Fitts intended to take the stand, the defense attorney replied that he did not know yet.

Judge Card then told the defense attorney that he would allow the defense attorney to *voir dire* Eckman outside the jury's presence, to see what Eckman's answers would be. During this *voir dire* examination, Eckman stated that he did not recall for certain whether the boys had asked him where they could buy marijuana, but Eckman told the court that he did not purchase drugs for any of his customers—that he purposely kept himself ignorant of potential sources for illegal drugs. And Eckman flatly stated that neither Fitts nor Gonzalez had given him any money.

After hearing Eckman's answers on *voir dire*, Judge Card concluded that there was no evidentiary basis for the defense attorney's proposed questions, and he therefore ruled that the defense attorney could not ask these questions in front of the jury. Fitts's attorney did not object to this ruling, nor did he make any further offer of proof. Rather, he simply announced, "I'll live with that ruling."

On appeal, Fitts contends that Judge Card's ruling infringed Fitts's right to confront his accusers. However, as we noted in

cess or control]." (Appellant's Opening Brief, page 18)

16. See *Whitescarver v. State*, 962 P.2d 192, 195 (Alaska App.1998) (even if a defendant honestly believes that another person is unlawfully withholding property that belongs to the defendant,

the defendant commits robbery if they assault the other person to make them relinquish the property).

17. See *Katmailand, Inc. v. Lake and Peninsula Borough*, 904 P.2d 397, 402 n. 7 (Alaska 1995); *Petersen v. Mutual Life Ins. Co. of New York*, 803

*McIntyre v. State*[18], a litigant "is not entitled to present baseless accusations or unfounded speculation" to the jury; "the proponent of any potentially prejudicial evidence should normally be required to establish a good-faith factual basis before commencing inquiry [on that subject]." [19] In this context, "good-faith basis" means that the attorney reasonably believes that the implicit predicate of the questions will be supported by admissible evidence.[20]

In Fitts's case, the defense attorney told Judge Card that he had no evidence to support his inquiry. The defense attorney asserted that the proposed questions were supported by information obtained during his conversations with Fitts—but he also forthrightly told the court that Fitts had not yet decided whether to take the stand. Thus, the defense attorney implicitly acknowledged that he did not know whether his proposed questions would be supported by admissible evidence.

Under these circumstances, Judge Card prudently allowed the defense attorney to conduct a *voir dire* examination of Eckman, to see what answers Eckman might give to the questions. But this *voir dire* examination yielded no further support for the defense attorney's proposed questions. The defense attorney essentially conceded that this was true: for when Judge Card stated that there still was no evidence to support the proposed questions, the defense attorney told the court, "I'll live with that ruling."

■ Given this record, it appears that the defense attorney did not preserve any objection to Judge Card's ruling. But even assuming that he did, the defense attorney failed to identify any admissible evidence to support his proposed cross-examination of Eckman.

We note that Fitts ultimately chose not to testify at his trial. Thus, the defense attorney's proposed questions might have given rise to the prejudice suggested by the prosecutor. Had the jury heard the questions posed to Eckman during the *voir dire* examination, the jurors might have been encouraged to speculate that, despite Eckman's explicit denials of wrongdoing, the defense attorney's questions were based on evidence that somehow had been excluded from the trial.

We therefore conclude that Judge Card did not abuse his discretion when he prevented the defense attorney from asking these questions in front of the jury.

*The prosecutor's comment on Fitts's defense strategy during summation to the jury*

In the defense summation to the jury, the defense attorney did not dispute that Fitts and Gonzalez had assaulted the cab driver by pointing a gun at him and by punching him. Rather, the defense attorney argued that Fitts's conduct was the result of an unfortunate financial transaction with a dishonest cab driver. According to the defense attorney, the cab driver lured Fitts and Gonzalez into giving him $100 in exchange for the driver's promised help in obtaining some unspecified unlawful commodity or service. Then, the defense attorney contended, the cab driver tried to keep the money without performing his side of the bargain.

After the defense attorney made this argument, the prosecutor responded in rebuttal:

> *Prosecutor:* With robbery cases, most of the time you can expect the defense to be a "Who done it?" ... Well, in this [case], the defense reserved its opening statement, so they've kind of sat back and said, "Well, we'll see what the evidence is, [and]

P.2d 406, 410 (Alaska 1990); *Wren v. State*, 577 P.2d 235, 237 n. 2 (Alaska 1978).

18. 934 P.2d 770 (Alaska App.1997).

19. *Id.* at 774.

20. *See State v. Smallwood*, 594 N.W.2d 144, 150 (Minn.1999); *State v. Fallin*, 540 N.W.2d 518, 522 (Minn.1995); *State v. Marble*, 21 Kan.App.2d 509, 901 P.2d 521, 524 (1995); *State v. Rodriguez*, 136 N.H. 505, 618 A.2d 810, 813–14 (1992);

*United States v. Glynn*, 627 F.2d 39, 43 (7th Cir.1980).

*See also Skiver v. State*, 213 Ga.App. 424, 444 S.E.2d 836, 838 (1994) (explaining that, although the attorney "must be able to show that the questions posed ... were asked in good faith and based on ... admissible evidence[,] ... there is no requirement that the evidence available [to the attorney] be actually admitted into evidence. [Rather, the law requires only that] this testimony could have been introduced at trial.").

then we'll decide what our defense is." [They didn't want] to stand up in front of you and say, "Mr. Fitts didn't do this. [He doesn't] know what they're talking about." They waited until they heard all the evidence before they decided what their defense is, and [then] decided, "Well, we're not going to go with the 'who done it'."

*Defense Attorney:* Judge, I'm going to object to this line of [argument]. [The prosecutor] has no clue as to what …

*The Court:* Objection overruled.

*Defense Attorney:* … my defense was.

*The Court:* Thank you, sir. Objection overruled.

*Prosecutor:* They decided to go, "Well, … we're going to attack the victim, just like a sexual assault [case]. Oh, lady, you consented. Oh, lady, … you asked for it." And it's that kind of defense that you see going [on] here. Frankly, one of the things that brings our system of justice into disrepute [is], in the eyes of some people, … [indiscernible].

On appeal, Fitts contends that the trial judge should have sustained his attorney's objection to the prosecutor's argument. Fitts argues that the prosecutor's argument was improper because (1) he accused the defense attorney of acting unethically by fabricating a defense after hearing the State's case, and (2) he attempted to unfairly inflame the jury against Fitts by comparing Fitts to a defendant who unjustifiably attacks the victim of a sexual assault. Fitts's first argument was preserved by his objection, but his second argument is new on appeal, and thus (with respect to this argument) he must show plain error.

■■■ With regard to Fitts's preserved objection, the legality of the prosecutor's argument presents a close question. On the one hand, our law allows defense attorneys to reserve their opening statements until the close of the State's case in chief. Indeed, our state constitution protects a criminal defendant's right to reserve many important decisions regarding defense strategy until the prosecution has presented its case.[21] It would be improper to suggest that a defense attorney behaved unethically by accepting the benefits of these procedural rules. On the other hand, in *Gray v. State*[22], the Alaska Supreme Court upheld a prosecutor's right to point out that a defendant does not have to present a case until the State has presented its own case, and thus defendants are able to fashion their testimony so as to avoid direct confrontation with the strongest parts of the government's case. In *Gray*, the court held that the following argument was an "[allowable] comment on the evidence and the trial tactics of defense counsel":

> [T]he defendants did not know [until the State's case was ended] what testimony they would give, what story they would tell, what defense they would [present].… [T]hey attempted to controvert every fact until the overwhelming evidence placed them [at the scene of the crime] and no other alternative was available to them [except to testify that they did not shoot with an intent to kill].

*Id.,* 463 P.2d at 907.

■■■ In the end, regardless of the merits of Fitts's objection, we are convinced that any error was harmless. As explained in the last section of this opinion, the State's case against Fitts was quite strong. Fitts did not challenge the fact that he was one of the robbers. (As noted above, Fitts's wallet was found in the back of the cab after the robbers fled and, shortly after the robbery, the cab driver identified Fitts as the robber who held the gun.) In his summation to the jury, Fitts's attorney did not dispute that Fitts had assaulted the cab driver. Rather, he argued that the assault had been triggered by the cab driver's attempt to swindle Fitts and Gonzalez (by refusing to return their $100). But this was no defense. Even if Fitts had assaulted the cab driver because the driver wrongfully refused to return the boys' money, Fitts's conduct would still constitute armed robbery.[23] Given these facts,

**21.** *See Scott v. State,* 519 P.2d 774, 783–84, 787 (Alaska 1974).

**22.** 463 P.2d 897 (Alaska 1970).

**23.** *See Whitescarver v. State,* 962 P.2d 192, 195 (Alaska App.1998) (even if a defendant honestly believes that another person is unlawfully withholding property that belongs to the defendant,

we conclude that any potential impropriety in the prosecutor's argument could not have affected the jury's verdict.

 For this same reason, we hold that Fitts's second, unpreserved objection to the prosecutor's argument does not present plain error.

the defendant commits robbery if they assault the other person to make them relinquish the prop-

*Conclusion*

The judgement of the superior court is AFFIRMED.