Adam B. HAMILTON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7762.

Court of Appeals of Alaska.

Nov. 22, 2002.

Rehearing Denied Dec. 19, 2002.

**21.** See *John v. State*, 35 P.3d at 64–65 (Mannheimer, J., concurring).

Marcia E. Holland, Assistant Public Defender, Fairbanks, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

Adam B. Hamilton appeals his convictions for first-degree burglary and first-degree murder. He contends that most of the evidence against him was obtained as a result of an unlawful investigative stop. He also contends that, during his trial, the prosecutor improperly referred to his post-arrest silence, and that the trial judge should have ordered a mistrial because of the prosecutor's comments. Finally, Hamilton contends that the trial judge improperly refused to allow the jury to consider Hamilton's pro-posed defenses of self-defense and heat of passion. For the reasons explained here, we reject each of these contentions and affirm Hamilton's convictions.

In addition, Hamilton argues that his sentence should be vacated; he contends that the sentencing judge, like the prosecutor, relied on Hamilton's post-arrest silence. We do not agree with Hamilton's characterization of the sentencing judge's remarks, and we therefore affirm Hamilton's sentence.

*Underlying facts of the homicide*

David Dixon, his wife Rebecca, and their three-year-old daughter lived at 385 Winter Street in Fairbanks. This residence is located a few miles north of the downtown area, just off the Old Steese Highway near Chena Hot Springs Road. The Dixons shared the residence with another couple, Jason Starkey and Heather Woods.

The Dixons fell asleep watching television around 11:00 p.m. on the night of November 23, 1999. Shortly before 2:30 a.m., Rebecca Dixon awoke to find her husband struggling with an intruder—"a tall figure wearing a leather jacket". The intruder stabbed David Dixon repeatedly with a long knife and threw him around the room like a "rag doll". Rebecca Dixon could not see the intruder's face because he was wearing a stocking cap or ski mask, and because he had a bandana across his face.

As soon as Rebecca Dixon realized the danger, she grabbed her daughter, who had been sleeping on a bed at the foot of the Dixons' bed, and shielded her daughter's head and ears "so she couldn't hear or see what was happening". Rebecca's movement attracted the attention of her husband's attacker. He stopped stabbing her husband and stared at her for a moment. Then the attacker dropped David Dixon in front of a couch, stabbed him a couple more times in the back, and ran out of the house.

Rebecca ran screaming to the loft where Jason Starkey and Heather Wood slept. While the two women tried to stop the bleeding, Starkey called 911. The 911 call was received at 2:32 a.m.

A few minutes later, when the ambulance arrived, Rebecca Dixon telephoned her husband's best friend, Adam Hamilton, because she knew that Hamilton would be the first person that her husband would call if he needed help. But no one was home at Hamilton's house. Rebecca left a message on Hamilton's answering machine.

David Dixon had been stabbed twenty-eight times, primarily in the head, neck, chest, and back. He died from his wounds.

A considerable amount of physical evidence tied Hamilton to this crime. His clothing was stained with fluids that probably came from Dixon's body. A blood-stained stocking cap and a blood-stained bandana were found in his vehicle. Hamilton's jacket was missing an "airborne pin" or "parachute badge" (a lapel or garment pin in the shape of two wings); Rebecca Dixon found this pin on the floor of her residence, near her husband's body. And Hamilton's shoes matched two bloody footprints that were found on the floor and carpet of the Dixon residence.

From the beginning of the trial, Hamilton conceded that he was the one who entered the house and stabbed Dixon. Hamilton suggested, however, that Dixon had let him into the house and that therefore the entry was not a burglary. Hamilton also suggested that Dixon must have done something to spark the confrontation, and that therefore Hamilton was not guilty of first-degree murder but rather a lesser degree of homicide. The jury rejected these suggestions and convicted Hamilton of first-degree burglary and first-degree murder.

### The legality of the investigative stop

As just explained, the 911 call was received at 2:32 a.m. Almost immediately, news of the break-in and stabbing was broadcast over the radio frequencies used by the state troopers and the Fairbanks police.

Alaska State Trooper Sgt. Kevin Kemp was conducting a DWI traffic stop on the west side of town, in the parking lot of the Safeway store at the corner of University and Airport Roads. Leaving his DWI suspect in the custody of a backup officer, Kemp started driving toward the crime scene. He headed east on Airport Road toward the Steese Highway. When he reached the Steese, he turned north, heading toward Chena Hot Springs Road and the Dixon residence.

Given the time of day, traffic was light as Kemp drove through Fairbanks. In fact, as Kemp headed north on the Steese Highway, he saw only two non-police vehicles after he passed Trainor Gate Road. These two vehicles were a snow grader and a four-door sedan, both headed south. That is, these two vehicles were traveling in the opposite direction from Kemp—away from the crime scene.

Kemp saw these two vehicles in front of him (i.e., north of him) as he crossed Farmers Loop Road. The sedan was passing the snow grader and was illuminated by the grader's lights. Kemp observed that the sedan had a "whale tail" (i.e., a spoiler) mounted on its trunk and had a long antenna in back. Kemp also saw that the driver had long hair and was sitting tall in the seat, but he could not tell what the driver was wearing, or whether the driver was a man or a woman.

Kemp wanted to record the license plate number of the sedan (so that the authorities could contact the driver later), but he was unable to see the sedan's license plate. Kemp knew that there were at least two Fairbanks police cars behind him so, using his radio, he asked these officers to record the license plate number of the sedan that was headed toward them. Kemp broadcast this request for assistance at 2:42:30 a.m.—that is, ten minutes after the 911 call.

Officer Pearl J. Turney was one of the Fairbanks police officers who was behind Kemp. She had been patrolling the central area of Fairbanks when she heard the dispatch report of the break-in and stabbing. Turney drove out the Steese Highway to where it intersects with Farmers Loop Road, and there she set up an observation post.

Turney was in this location when she heard Kemp's request for assistance. From her vantage point, Turney could see the snow grader and the sedan that Kemp had described. After the sedan passed her, Turney

pulled onto the Steese Highway and headed south, following the sedan.

As Turney got closer to the sedan, she saw that its license plate was covered with snow, making it impossible to read the license plate number. She advised dispatch that the license plate was obscured, and she described the sedan's make and model.

As Turney followed the sedan, it traveled south to the Johansen Expressway and then turned west. When Turney informed her fellow officers that the sedan had left the Steese Highway and was now traveling west on the Johansen, her supervisor (Sgt. Matthew Soden) modified Kemp's request for the license plate number. Soden told her to wait for backup, then stop the sedan and interview its occupants.

Turney continued to follow the sedan. The car left the Johansen Expressway and turned onto College Road (still heading west). Turney now had backup from Officer Gertha Wells, who had reached College Road in time to see the sedan and Turney's patrol car drive past. Turney and Wells conferred and decided to stop the sedan near the corner of College and Marietta.

When Turney activated her overhead lights, the driver of the sedan pulled onto Marietta and stopped. The time was 2:46 a.m.—fourteen minutes after the 911 call, and less than four minutes after Kemp radioed his request for assistance in identifying the sedan.

Both Turney and Wells parked their patrol cars, and Turney approached the sedan on foot while Wells provided cover. When Turney reached the rear of the sedan, she brushed the snow from the license plate so that the license plate number was visible. Wells immediately radioed the number to their dispatcher.

Turney continued walking toward the front of the sedan, on the driver's side. As she neared the driver's door, she looked through the window and saw that the driver's hands were covered with blood. Turney backed away from the car, drew her sidearm, and ordered the driver to get out of the car with his hands up and in plain sight.

The driver was Adam Hamilton. The ensuing searches of his person, his clothing, and his vehicle yielded the majority of the State's evidence linking Hamilton to the burglary/homicide.

The question is whether the police had the right to stop Hamilton's car. The State offers two justifications for this traffic stop.

First, Alaska law—AS 28.10.171(b)—requires drivers to maintain their license plates "in a location and condition so as to be clearly legible". The State argues that because the license plate of Hamilton's vehicle was covered by snow, the police were authorized to stop him and cite him for this offense. Second, the State argues that the police were authorized to stop Hamilton because they had reason to believe that he was a potential witness—*i.e.*, reason to believe that he might have observed something that would be pertinent to their investigation of the break-in and stabbing.

*(a) Whether the stop of Hamilton's vehicle was justified because of Hamilton's violation of AS 28.10.171(b)*

Hamilton acknowledges that his license plate was covered with snow at the time he was stopped. However, he points out that none of the officers involved in the traffic stop ever claimed that they requested or performed the stop so that Hamilton could be cited for driving with an illegible license plate. Instead, all of the officers testified that Hamilton was stopped because they wanted to find out if he knew anything or had seen anything that would further their investigation of the break-in and stabbing. Because the officers did not subjectively rely on the illegible license plate as a basis for their actions, Hamilton argues that the State is barred from relying on this after-the-fact justification for the stop.

But, in fact, the State *is* allowed to rely on an after-the-fact justification, so long as the facts known to the officers at the time of the investigative stop are sufficient to establish the legal foundation for this justification. We decided this point of law in *Beauvois v. State*, 837 P.2d 1118 (Alaska App. 1992). In *Beauvois*, we held that the legality

of an investigative stop hinges on an objective test: whether the facts known to the officers established a legitimate basis for the stop. The officers' subjective theories as to why the stop was proper are irrelevant.[1]

Hamilton contends that we receded from this position in *Castle v. State*, 999 P.2d 169 (Alaska App.2000). But Hamilton has misconstrued our holding in that case.

In *Castle*, a police officer attempted to conduct an investigative stop of the defendant. Fleeing from the officer, the defendant committed a minor offense: running in the middle of the street, a violation of a municipal ordinance regulating pedestrian traffic.[2] We held that the officer's initial effort to conduct an investigative stop had been illegal.[3] The remaining question was whether the State could rely on Castle's ensuing violation of the municipal ordinance to justify the ultimate stop. We said no; the State could not rely on Castle's act of running in the street to justify the stop—because Castle's violation of the pedestrian ordinance was "the direct result of [the officer's] unjustified attempt to seize [Castle]", and because "the policy of the exclusionary rule would be undermined if we allowed Castle's conduct to form the justification for his ensuing arrest".[4]

Hamilton, like the defendant in *Castle*, committed a minor infraction of the law in the sight of police officers, but there the resemblance ends. Hamilton did not cover his license plate with snow in response to illegal conduct by the police. Thus, Hamilton's case is governed by the rule we announced in *Beauvois*: the legality of the traffic stop is determined by an objective assessment of the facts known to the officers at the time they conducted the stop.

As Officer Turney was following Hamilton's vehicle on the Johansen Expressway, she radioed that she could not see Hamilton's license plate number because the license plate was covered with snow. That is, Turney knew that Hamilton's license plate was covered with snow before she commenced the seizure of Hamilton's vehicle—*i.e.*, before she turned on her overhead lights and signaled Hamilton to stop at the corner of College and Marietta.

This fact is sufficient to establish the legality of the ensuing traffic stop under federal law. In *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the Supreme Court rejected the doctrine of the "pretext" traffic stop and held instead that, no matter what may have prompted police officers' interest in a vehicle or its occupants, a traffic stop is legal so long as the officers had probable cause to believe that a violation of the traffic code (or any other violation of the law) had occurred in their presence.[5]

Here, Officer Turney had probable cause to believe that Hamilton's vehicle was being driven in violation of AS 28.10.171(b), the statute requiring that license plates be maintained in a legible condition. It is a misdemeanor to violate this statute.[6] Thus, Turney was authorized to stop Hamilton's vehicle and either arrest him or cite him for this violation.[7] And, as we held in *Beauvois*, it is irrelevant that Turney did not actively consider or subjectively rely on this basis for the traffic stop.

Hamilton suggests (although he does not directly argue) that we should reject *Whren* as a matter of state constitutional law and then invalidate his traffic stop. Hamilton points out that even if his violation of the license plate law might conceivably have justified the police in stopping his vehicle, the fact of the matter is that the officers' true

1. *Beauvois*, 837 P.2d at 1121 n. 1.

2. *Castle*, 999 P.2d at 170–71.

3. *See id.* at 173–74.

4. *Id.* at 177.

5. *See Whren*, 517 U.S. at 813–19, 116 S.Ct. at 1774–77.

6. AS 28.40.050(a)-(b).

7. *See* AS 12.25.030(a)(1) (a police officer may arrest a person without a warrant when the person commits a crime in the officer's presence); AS 12.25.180(a) (a police officer who stops or contacts a person for committing a misdemeanor may either arrest them or issue them a citation, at the officer's discretion).

motive for stopping Hamilton was to investigate the break-in and stabbing, not to enforce the license plate law. Thus, Hamilton contends, we should not allow the State to rely on the "pretext" of Hamilton's violation of the license plate law.

We conclude that Hamilton's case does not require us either to accept or reject *Whren* as a matter of Alaska constitutional law. We reach this conclusion because we hold that the police were justified in stopping Hamilton's car as part of their investigation of the break-in and stabbing.

*(b) The stop of Hamilton's vehicle was justified as an investigative stop of a potential witness*

Under the test for investigative stops adopted by our supreme court in *Coleman v. State*, 553 P.2d 40 (Alaska 1976), the police must have "reasonable suspicion that imminent public danger exists or [that] serious harm to persons or property has recently occurred".[8] As this Court emphasized in *State v. G.B.*, 769 P.2d 452 (Alaska App. 1989),

> the *Coleman* rule is ultimately rooted in common sense and practicality. In each case, compliance with *Coleman's* requirement of recently committed serious harm must be evaluated with a view toward the fundamental concern of the *Coleman* court: the risk that an investigative stop based on mere suspicion may be used as a pretext to conduct a search for evidence. As indicated in *Coleman*, the fundamental inquiry in each case is whether "a prompt investigation [was] required ... as a matter of practical necessity."

*G.B.*, 769 P.2d at 456.[9]

In *Beauvois v. State*[10] and *Metzker v. State*[11], we upheld investigative stops based on the need to identify and interview witnesses who may have information pertinent to the investigation of a recently committed serious crime—even when there is no reason

to believe that the people who are being stopped committed the crime. We reach a similar conclusion here.

In the present case, when the police stopped Hamilton's car, they knew that an intruder had entered a residence in the middle of the night, had perpetrated an apparently fatal assault, and then had fled. The police also knew that the assailant had been at large for approximately fifteen minutes. (The 911 call was received at 2:32 a.m.; Hamilton's car was pulled over at 2:46 a.m.)

As Hamilton points out in his brief, there were several routes that the assailant might have taken when fleeing the scene of the crime. But the main route from the Dixon residence to the city center was the Steese Highway. Sgt. Kemp observed Hamilton's car traveling south (away from the Dixon residence) on the Steese Highway at 2:42 a.m.—*i.e.*, ten minutes after the 911 call. Kemp testified that, aside from the snow grader and the police cars, there were no other vehicles on the Steese Highway between Trainor Gate Road (the north part of central Fairbanks) and the Dixon residence.

Kemp could reasonably suspect that the people in this southbound vehicle had seen something—a person or another vehicle, for example—that might prove important to the investigation of the just-committed burglary and assault. But as Kemp continued north toward the Dixon residence, he watched these potential witnesses drive out of sight to the south. He therefore broadcast a request for assistance—not asking the Fairbanks police to stop the vehicle, but merely to record its license plate number so that the authorities could contact the driver later.

Had the Fairbanks police simply recorded Hamilton's license plate number and allowed him to drive on unimpeded, there would have been no Fourth Amendment issue in this case. But when Officer Turney got behind Hamilton's car, she saw that Hamilton's license plate was covered with snow, thus

---

8. *Coleman*, 553 P.2d at 46.

9. Quoting *Coleman*, 553 P.2d at 46, which in turn was quoting *Goss v. State*, 390 P.2d 220, 224 (Alaska 1964), *overruled on other grounds by Glasgow v. State*, 469 P.2d 682 (Alaska 1970).

10. 837 P.2d at 1121.

11. 797 P.2d 1219, 1221 (Alaska App.1990).

making it impossible to obtain the license plate number without stopping the vehicle.

To summarize the situation at that point: A serious assault had been committed in the middle of the night—an assault which, given the nature and the number of David Dixon's wounds, threatened to become a homicide at any moment. The state troopers and the Fairbanks police responded within minutes. As they made their way to the crime scene, they saw only one private vehicle driving toward central Fairbanks, away from the neighborhood of the crime. The officers had reason to believe that the occupant(s) of this car might have seen something that would aid their investigation. But because the license plate of this vehicle was covered with snow, it was not possible to identify the vehicle and contact the driver later. If the police were to speak with these potential witnesses, it had to be right then.

Under these circumstances, we conclude that the *Coleman* rule was satisfied: "a prompt investigation [was] required ... as a matter of practical necessity". We therefore uphold the legality of the investigative stop under *Beauvois* and *Metzker*—without regard to the independent ground that driving with a snow-covered license plate is a misdemeanor under AS 28.10.171(b) and AS 28.40.050(a)-(b).

*The defense request for mistrial after the prosecutor elicited testimony that Hamilton failed to express concern for anyone else following the traffic stop*

■ Three of the State's witnesses described Hamilton's behavior at the scene of the stop and, later, at the hospital (where he was taken for treatment of a wound to his thigh).

Officer Turney described Hamilton as "very calm" and cooperative during the traffic stop, even after he was ordered out of the car and handcuffed. Another officer who arrived shortly after the stop agreed that Hamilton was "calm and unemotional". Turney further testified that, during the ride to the hospital, Hamilton expressed concern about his wound (he apparently was having difficulty either feeling or wiggling his toes), but he did not express concern about anyone else. And Sergeant Kemp, who saw Hamilton after he arrived at the hospital, testified that Hamilton was "fairly calm".

Hamilton's attorney conceded that the State was entitled to introduce evidence of Hamilton's demeanor—*i.e.*, evidence that Hamilton had been calm and unemotional. But he objected to Officer Turney's testimony that Hamilton had not expressed concern for anyone else. The defense attorney argued that this testimony was a comment on Hamilton's right to remain silent about the crime for which he was being investigated. He asked the trial judge either to declare a mistrial or to give a cautionary instruction to the jury.

The trial judge, Superior Court Judge Richard D. Savell, denied the request for a mistrial but granted the request for a cautionary instruction. Judge Savell asked the defense attorney to draft an instruction, but the defense attorney declined. Instead, the defense attorney outlined generally what he wanted the instruction to say, and then he asked Judge Savell to come up with the exact language.

When court resumed session, Judge Savell told the jurors:

> *The Court:* Ladies and gentlemen, I want to remind you that the defendant at all stages of a criminal proceeding is not obliged to make any statements or produce any evidence. And, in fact, it's his right not to do so. Go ahead, Mr. Satterberg [the defense attorney].

Nothing further was said about this issue until the next day, when Hamilton's attorney renewed his motion for a mistrial. The defense attorney cursorily asserted that "the court's curative instruction was not strong enough", but he did not explain why he thought so, nor did he suggest any supplement to the court's instruction. Instead, the defense attorney immediately proceeded to his main argument that a mistrial was required under this Court's ruling in *Silvernail v. State*, 777 P.2d 1169 (Alaska App.1989).

In *Silvernail*, the defendant and two other men were arrested and then charged with

kidnapping and murder.[12] At trial, Silvernail asserted that he had been an unwilling participant—that his two companions had coerced him to aid the kidnapping and murder.[13]

Silvernail took the stand to testify in support of this coercion theory. During the prosecutor's cross-examination of Silvernail, the prosecutor asked him why he had not explained his situation to the police officers who arrested him:

> *Prosecutor:* When Officer Gaines came and took you out of the passenger seat, did you say to him, "God, I'm glad you're here."?
>
> *Silvernail:* No.
>
> *Prosecutor:* Did you say anything about the fact that you had just been scared to death?
>
> [Objection by defense counsel; overruled]
>
> *Prosecutor:* You never said to the police officer, when he came up to the car, "Hey, [my companions] just killed a guy. Let me tell you about it."?
>
> *Silvernail:* No.
>
> *Prosecutor:* You never said, "Gee, I'm relieved. You're finally here to help me." Right?
>
> *Silvernail:* No, I didn't say that.

*Silvernail,* 777 P.2d at 1172–73.

On appeal, we held that this testimony should have been excluded under Alaska Evidence Rule 403 because its probative value was so heavily outweighed by its potential for unfair prejudice.

We pointed out that "in most circumstances[,] silence is so ambiguous that it is of little probative force.... [Although silence] gains more probative weight where it persists in the face of accusation, ... [f]ailure to contest an assertion ... is considered evidence of acquiescence only if it would have been natural under the circumstances to ob-

ject to the assertion in question." [14] And we concluded that, given the fact that Silvernail was taken into custody after attempting to evade the police and while wearing a shirt soaked with the victim's blood, "it would hardly have been natural under the circumstances for Silvernail to have made a full disclosure of his situation".[15] We explained:

> At the time of arrest and during custodial interrogation, [the] innocent and [the] guilty alike—perhaps particularly the innocent—may find the situation so intimidating that they may choose to stand mute. A variety of reasons may influence that decision. In these often emotional and confusing circumstances, a suspect may not have heard or fully understood the question, or may have felt there was no need to reply. He may have maintained silence out of fear or unwillingness to incriminate another. Or the arrestee may simply react with silence in response to the hostile and perhaps unfamiliar atmosphere surrounding his detention.

*Silvernail,* 777 P.2d at 1177.[16]

Given our ruling in *Silvernail,* it is fairly obvious that the testimony challenged here— Officer Turney's testimony that Hamilton failed to express concern for anyone else— was objectionable and should not have been admitted. In its brief to this Court, the State does not really argue otherwise.

But the issue is not the admissibility of this testimony. As explained above, Judge Savell sustained the defense attorney's objection to this testimony and, at the defense attorney's request, the judge gave a curative instruction to the jury. Instead, the issue is whether the curative instruction was inadequate to remedy the harm, so that a mistrial was still required.

When Hamilton's attorney renewed his motion for mistrial on the following day, Judge Savell declared that he believed it was "a close call" whether he should declare a

---

**12.** *Silvernail,* 777 P.2d at 1171.

**13.** *See id.*

**14.** *Silvernail,* 777 P.2d at 1176 (quoting *United States v. Hale,* 422 U.S. 171, 176, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99 (1975)).

**15.** *Id.* at 1176–78.

**16.** Quoting *Hale,* 422 U.S. at 177, 95 S.Ct. at 2137.

mistrial. The judge added that he "[could] imagine circumstances ... that would tip the scale in either direction from here". In the end, however, Judge Savell was not convinced that a mistrial was required.

█ A trial judge's decision to grant or deny a mistrial is reviewed under the "abuse of discretion" standard.[17] This means that we will reverse the trial court's decision "only when we are left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling." [18]

█ A timely curative instruction is presumed to remedy the unfair prejudice that might otherwise arise from inadmissible testimony.[19] In Hamilton's case, immediately following the defense attorney's objection to Turney's testimony, Judge Savell instructed the jury that Hamilton had a right to decline to make any statements. We have previously recognized that such an instruction can be sufficient to cure the error when a jury hears testimony concerning a defendant's pre-arrest silence.[20]

As explained above, this curative instruction was given at the defense attorney's request, after the attorney outlined what he wanted the judge to say. Although the defense attorney later complained that the instruction had not been "strong enough", he never suggested alternative or supplemental wording. And, indeed, Hamilton's appellate attorney does not attack the wording of the instruction.

We have already noted that when Judge Savell ruled on the motion for mistrial, he warned that he "[could] imagine circumstances ... that would tip the scale in either direction from here". But events that might have prompted Judge Savell to revise his ruling never came to pass. The prosecutor never asked another witness about Hamilton's concern or lack of concern for other people's welfare, and the prosecutor did not mention this theme during his summation to the jury.

On appeal, Hamilton suggests that the prejudice of the inadmissible testimony was exacerbated by the contemporaneous press coverage of the trial. During the second day's argument on the motion for mistrial, Hamilton's trial attorney pointed out that the local newspaper was carrying the headline, "Accused calm after stabbing death".

But as Judge Savell correctly noted, this newspaper headline was a "red herring" because everyone agreed (in fact, the defense attorney expressly conceded) that it was proper for the jury to hear testimony concerning Hamilton's demeanor—*i.e.*, testimony that he was calm and unemotional following the traffic stop. The issue confronting the court was what to do about Turney's testimony that Hamilton had failed to express concern for anyone else. There is nothing in the record to indicate that the newspaper article mentioned this testimony. Likewise, there is nothing in the record to indicate that any of the jurors disobeyed Judge Savell's instructions to insulate themselves from media coverage of the trial.

Having reviewed the record, we conclude that Judge Savell did not abuse his discretion when he concluded that the curative instruction was sufficient to remedy the problem and that a mistrial was not required.

*Was Hamilton entitled to an instruction on self-defense or an instruction on heat of passion?*

█ In his opening statement, Hamilton's attorney suggested that Hamilton acted in self-defense when he stabbed Dixon, or at least that Dixon had provoked Hamilton's violence (thus potentially mitigating the crime to manslaughter due to heat of passion). But when the presentation of evidence was completed, Judge Savell ruled that Hamilton was not entitled to jury instructions on self-defense or heat of passion.

17. *See Walker v. State,* 652 P.2d 88, 92 (Alaska 1982); *Roth v. State,* 626 P.2d 583, 585 (Alaska App.1981).

18. *Keogh v. W.R. Grasle, Inc.,* 816 P.2d 1343, 1349 n. 11 (Alaska 1991).

19. *See Roth,* 626 P.2d at 585.

20. *See Hamilton v. State,* 771 P.2d 1358, 1360 (Alaska App.1989).

A defendant is entitled to have the jury instructed on self-defense or heat of passion (or any other defense) if there is "some evidence" to support the defense. In this context, "some evidence" is a term of art; it means evidence which, when viewed in the light most favorable to the defendant, is sufficient to support a finding in the defendant's favor by a reasonable fact-finder on each element of the proposed defense.[21]

(In the case of self-defense and heat of passion, the government ultimately bears the burden of disproving the defense beyond a reasonable doubt. Thus, the evidence is sufficient to support a finding in the defendant's favor if it is sufficient to engender a reasonable doubt on each element of the proposed defense.)

At trial, Hamilton's attorney argued that a plausible case of self-defense was established by the following evidence: (1) the wound to Hamilton's leg; (2) Rebecca Dixon's testimony that Hamilton and Dixon were struggling when she first awoke; (3) the fact that Hamilton and Dixon were best friends—suggesting that Dixon must have done something to trigger this kind of conduct from Hamilton; and (4) the lack of evidence of a forced entry—suggesting that Dixon voluntarily permitted Hamilton to enter the house. But Judge Savell concluded that none of this would support a reasonable inference that Dixon had attacked Hamilton or had provoked Hamilton to violence.

On appeal, Hamilton renews his contention that he was entitled to jury instructions on self-defense [22] and heat of passion (i.e., serious provocation by the victim) [23]. But Hamilton's argument in support of these defenses consists primarily in noting that Dixon and Hamilton were friends, that there was no apparent reason for Hamilton to attack Dixon, and that Hamilton may have induced Dixon to open the door to him voluntarily (a factual assertion that the jury rejected when they convicted Hamilton of burglary).

It is true that the State offered no motive for Hamilton's attack on Dixon. However, the evidence showed that Hamilton came to Dixon's residence in the middle of the night, when everyone in the house was asleep. Regardless of how Hamilton obtained entry, he was armed with a knife and was wearing a bandana to cover his face. When Rebecca Dixon awoke, she saw her husband struggling with Hamilton, but there was no evidence that Dixon was doing anything other than trying to defend himself. David Dixon was unarmed, he was clothed only in his underwear, and he was crouched on the floor while Hamilton stabbed him repeatedly with a downward motion. At this point, there was already blood bubbling from Dixon's mouth. Hamilton then began to throw Dixon around the room "like a limp rag doll", all the while continuing to stab him. Dixon was no longer making any kind of resistance. When Rebecca Dixon moved from her bed to grab her daughter, Hamilton interrupted his attack and stared at her, but then he continued his attack—dropping Dixon in front of a couch and stabbing him a few more times in the back—before he ran from the house.

Neither Hamilton nor any other witness offered an explanation for Hamilton's violence or gave testimony suggesting that David Dixon had initiated or provoked the attack. It is true that Hamilton was bleeding from a wound to his thigh when the police stopped his car. But there was no evidence presented as to when Hamilton received this wound or how it was inflicted. Even assuming that the wound was a knife wound received while Hamilton was inside the Dixon residence, there was no evidence that Dixon was armed at any time during his struggle with Hamilton.

Given this evidence, any argument that Hamilton acted in self-defense or as a result of serious provocation by Dixon would be based on pure speculation. As we said in *Hilbish v. State*,

> One can certainly conjure scenarios involving self-defense or heat of passion that

---

**21.** *See Lamont v. State*, 934 P.2d 774, 777 (Alaska App.1997); *Ha v. State*, 892 P.2d 184, 190 (Alaska App.1995); *see also Snyder v. State*, 930 P.2d 1274, 1280 (Alaska 1996).

**22.** *See* AS 11.81.335 ("use of deadly force in defense of self").

**23.** *See* AS 11.41.115(a) & (f)(2) ("heat of passion" resulting from "serious provocation").

would arguably be consistent with the evidence at trial; in this sense, [the defendant might] plausibly maintain that the evidence at trial does not rule out the possibility of self-defense or heat of passion.... But the state was under no obligation to assume the burden of disproving self-defense until there was some evidence affirmatively suggesting that what might have happened actually did happen; [likewise, a defendant does not meet the] burden of establishing heat of passion as an affirmative defense merely because the evidence at trial did not disprove it.

891 P.2d 841, 852 (Alaska App.1995).

In Hamilton's case, as was true in *Hilbish*, the evidence that supposedly supports self-defense or heat of passion "is essentially neutral, that is, merely compatible with a theory of self-defense or heat of passion".[24] It has "no material bearing on the crucial issues involved in a claim of self-defense or heat of passion: whether [Dixon] actually used or threatened deadly force at the time of the [stabbing], whether [Hamilton stabbed Dixon] in defense against such force or threat, or whether [Dixon] engaged in any act of serious provocation".[25]

Even viewing the evidence in the light most favorable to Hamilton (which we are obliged to do), Hamilton's claims of self-defense or heat of passion rest on speculation; they find no reasonable support in the evidence. Judge Savell properly denied Hamilton's requests for jury instructions on self-defense and heat of passion.

■ One concluding note: In past decisions, including *Hilbish*, we have stated that the "abuse of discretion" standard governs our review of a trial judge's decision whether to instruct the jury on a proposed defense. This is not completely accurate. If there is "some evidence" of a proposed defense, a judge has no discretion to refuse a timely defense request for a jury instruction on that defense. This is an issue of law which we resolve *de novo* based on the entire record. Conversely, if there is not "some evidence" of the proposed defense, the defen-

dant is not entitled to have the jury instructed on that defense.

*Did Judge Savell penalize Hamilton for asserting his Fifth Amendment right to decline to explain his crime at sentencing?*

■ As already noted, the jury convicted Hamilton of first-degree burglary and first-degree murder. Judge Savell sentenced Hamilton to 99 years' imprisonment for the murder—the maximum term allowed by law.[26] (Hamilton received a concurrent 4-year prison term for the burglary.)

At sentencing, Hamilton declined to make a statement or present any evidence to explain his behavior. On appeal, Hamilton contends that Judge Savell held Hamilton's silence against him—that the judge's decision to impose a 99-year sentence was tainted by the judge's feeling that Hamilton was obliged to explain his behavior if he wanted to receive something less than the maximum sentence. But the record provides little support for this claim.

Shortly after Judge Savell began his sentencing remarks, he expressly acknowledged Hamilton's right to remain silent, and he declared that he would "not accept [any] suggestion that [Hamilton's] invocation of his right to silence [should] result in a harsher sentence for him." Judge Savell then made the remarks that Hamilton criticizes on appeal:

> *The Court:* I have to confess that ... [I] looked forward to the possibility of learning [during these sentencing proceedings] what could cause two close friends [*i.e.*, Hamilton and Dixon] to have their respective lives end this way. I looked forward to [this] sentencing in the hope that I would hear an explanation that could provide background, mitigation, and an understanding [of Hamilton's conduct].

But after saying this, Judge Savell immediately reiterated that he would not penalize Hamilton for asserting his right to remain silent:

---

**24.** *Hilbish,* 891 P.2d at 852.

**25.** *Id.*

**26.** *See* AS 12.55.125(a).

*The Court:* I accept that [explanation] is not forthcoming, and I'll not punish [Mr. Hamilton] for it. But [without such an explanation] I am limited ... in being [able] to assess [Hamilton's] remorse, rehabilitation potential, [and] whether and to what extent deterrence is likely or necessary or futile.

 Although it is improper for a sentencing judge to penalize a defendant for remaining silent, a sentencing judge remains obliged (as Judge Savell noted) to assess the seriousness of the defendant's crime, the prospects for the defendant's rehabilitation, and the extent to which imprisonment may be needed to deter the defendant from future acts of lawlessness and/or to protect the public until the defendant is rehabilitated.[27] When a defendant declines to offer evidence on these issues, the sentencing judge must base his or her decision on the existing record.[28]

The record in this case shows that Hamilton committed a vicious and apparently inexplicable murder. The evidence leaves little doubt that the murder was premeditated: Hamilton illegally entered the Dixon residence in the middle of the night, wearing a bandana over his face and armed with a dagger-like knife. He stabbed Dixon more than two dozen times, continuing his attack long after his victim was rendered defenseless by previous wounds.

We have repeatedly held that premeditated murder is among the most serious conduct within Alaska's definition of first-degree murder—and that, in first-degree murder

cases, a defendant's premeditation, standing alone, will support a sentence of 99 years' imprisonment.[29] Moreover, even in cases of second-degree murder (*i.e.*, cases in which the killing was unintended), we have repeatedly upheld sentences in the upper end of the penalty range for defendants who committed gratuitous or otherwise inexplicable acts of extreme violence.[30]

It was Hamilton's right not to offer evidence in explanation or mitigation of his conduct. But in the absence of extenuating information, Judge Savell was left with the record as it stood. That record fully supports Judge Savell's decision to impose the maximum sentence for first-degree murder. Given this record, and given Judge Savell's repeated statements that he would not penalize Hamilton for remaining silent, the fact that Hamilton received a sentence of 99 years' imprisonment raises no inference that Judge Savell was surreptitiously punishing Hamilton for failing to explain his conduct.

### *Conclusion*

The judgement of the superior court is AFFIRMED.

### ORDER DENYING REHEARING

Adam Hamilton seeks rehearing of our decision in his case, *Hamilton v. State*, 59 P.3d 760 (2002). Although Hamilton raises several arguments, we conclude that only one

---

27. *See* AS 12.55.005; *State v. Chaney*, 477 P.2d 441, 443–44 (Alaska 1970).

28. *Compare Lepley v. State*, 807 P.2d 1095, 1101 (Alaska App.1991) (when a defendant asserts the privilege to refuse a psychological evaluation in aid of sentencing, the sentencing judge must not draw an adverse inference from the defendant's assertion of privilege, but the consequence for the defendant is that the judge then assesses the defendant's potential for rehabilitation based on the existing evidence).

29. *See Nelson v. State*, 874 P.2d 298, 310 (Alaska App.1994); *George v. State*, 836 P.2d 960, 963 (Alaska App.1992); *Washington v. State*, 828 P.2d 172, 174 (Alaska App.1992); *Riley v. State*, 720 P.2d 951, 952 & n. 1 (Alaska App.1986).

30. *See Monroe v. State*, 847 P.2d 84, 92–93 (Alaska App.1993) (upholding a sentence of 60 years' imprisonment); *Norris v. State*, 857 P.2d 349, 356–58 (Alaska App.1993) (upholding a sentence of 50 years' imprisonment); *Page v. State*, 657 P.2d 850, 853–55 (Alaska App.1983) (upholding a sentence of 99 years' imprisonment); *Faulkenberry v. State*, 649 P.2d 951, 956–57 (Alaska App. 1982) (upholding a sentence of 60 years' imprisonment); *see also* the companion cases of *Gustafson v. State*, 854 P.2d 751, 763–67 (Alaska App.1993), and *Cheely v. State*, 861 P.2d 1168, 1178–1180 (Alaska App.1993) (upholding, respectively, sentences of 65 and 60 years' imprisonment).

of these arguments merits an explanatory response.

Hamilton's primary argument is that we misunderstood or misinterpreted the facts of the case when we upheld the investigative stop of Hamilton's vehicle. Specifically, Hamilton contends that we misunderstood the relevance of Officer Turney's observation that Hamilton's license plate was obscured by snow. Hamilton argues that, even though Turney may have been aware that the license plate was obscured as she followed Hamilton's vehicle down the highway, Turney's supervisor (Sgt. Sodden) was unaware of this fact when he ordered her to conduct an investigative stop of Hamilton's vehicle. Moreover, Hamilton argues, Turney never testified that her decision to stop Hamilton's vehicle was motivated by the fact that his license plate was obscured.

Hamilton's arguments rest on the implicit premise that the validity of the investigative stop hinges on Turney's subjective reasons for conducting the stop (or Sodden's subjective reasons for directing Turney to conduct the stop). This is incorrect. The validity of an investigative stop turns on an objective test: whether the investigative stop was objectively justified in light of the facts known to the police at the time they performed the stop. We clarified this point in our initial opinion in this case:

> [T]he State is allowed to rely on an after-the-fact justification [for the investigative stop], so long as the facts known to the officers at the time of the investigative stop are sufficient to establish the legal foundation for this justification. We decided this point of law in *Beauvois v. State*, 837 P.2d 1118 (Alaska App.1992). In *Beauvois*, we held that the legality of an investigative stop hinges on an objective test: whether the facts known to the officers established a legitimate basis for the stop. The officers' subjective theories as to why the stop was proper are irrelevant.

*Hamilton*, opinion at 764–65 (citing *Beauvois*, 837 P.2d at 1121 n. 1).

As we explained in our initial opinion, the facts known to the police provided an objective justification for stopping Hamilton's vehicle.

To summarize the situation at that point: A serious assault had been committed in the middle of the night—an assault which, given the nature and the number of David Dixon's wounds, threatened to become a homicide at any moment. The state troopers and the Fairbanks police responded within minutes. As they made their way to the crime scene, they saw only one private vehicle driving toward central Fairbanks, away from the neighborhood of the crime. The officers had reason to believe that the occupant(s) of this car might have seen something that would aid their investigation. But because the license plate of this vehicle was covered with snow, it was not possible to identify the vehicle and contact the driver later. If the police were to speak with these potential witnesses, it had to be right then.

Under these circumstances, we conclude that the *Coleman* rule was satisfied: "a prompt investigation [was] required ... as a matter of practical necessity".

*Hamilton*, opinion at 767.

Having considered this point as well as the other points raised in Hamilton's petition for rehearing, we conclude that Hamilton's petition should be **DENIED**.

Entered at the direction of the Court.